881 F.2d 1452
 58 USLW 2126, 16 Media L. Rep. 2089
 Jeffrey M. MASSON, Plaintiff/Appellant/Cross-Appellee,
v.
The NEW YORKER MAGAZINE, INC., Alfred A. Knopf, Inc., and
Janet Malcolm, Defendants/Appellees/Cross-Appellants.
 Nos. 87-2665, 87-2700.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 16, 1988.
Decided Aug. 4, 1989.
 
 Charles O. Morgan, Jr., San Francisco, Cal., for plaintiff/appellant/cross-appellee.
 Karl Olson, Cooper, White & Cooper, San Francisco, Cal., for defendants/appellees/cross-appellants.
 Appeal from the United States District Court for the Northern District of California.
 Before ALARCON, HALL and KOZINSKI, Circuit Judges.
 ALARCON, Circuit Judge:
 
 
 1
 In this libel action, plaintiff-appellant Jeffrey M. Masson appeals from the order of the district court granting summary judgment to defendants-appellees The New Yorker Magazine, Inc. ("The New Yorker"), Alfred A. Knopf, Inc. ("Knopf"), and Janet Malcolm. We affirm.
 
 I.
 
 2
 In 1983, Janet Malcolm published a two-part article in The New Yorker magazine concerning the termination of psychoanalyst Jeffrey M. Masson from his position as Projects Director of the Sigmund Freud Archives (Archives). The article, subsequently reprinted in book form by publisher Knopf, was largely based upon Malcolm's tape-recorded interviews with Masson. In the article, Malcolm described the struggle between Masson and other board members of the Archives, notably Dr. Kurt Eissler and Dr. Anna Freud, over Sigmund Freud's abandonment of the "seduction theory"--a hypothesis that assumes that certain mental illnesses originate in sexual abuse during childhood. Malcolm discussed Masson's claim that his contract with the Archives was terminated because he "went public" with his views that Freud abandoned the seduction theory simply to further his career and placate his colleagues.
 
 
 3
 On November 29, 1984, Masson filed this diversity action in the district court against Malcolm, The New Yorker, and Knopf. Masson contended that the defendants libeled him and placed him in a false light in violation of Cal.Civ.Code Sec. 45 (West 1982). Masson contended that Malcolm fabricated words attributed to him within quotations marks, and misleadingly edited his statements to make him appear "unscholarly, irresponsible, vain, [and] lacking impersonal [sic] honesty and moral integrity." He also charged that The New Yorker and Knopf knew of Malcolm's misconduct prior to publication of the article and book.
 
 
 4
 Each of the defendants moved for summary judgment. The district court granted these motions on the ground that Masson had failed to establish actual malice. 686 F.Supp. 1396. The district court concluded that "[n]o clear and convincing evidence exists that would justify a finding that ... [Malcolm, The New Yorker, or Knopf] entertained serious doubts about the truth of the disputed passages."
 
 II.
 
 5
 "A grant of summary judgment is reviewed de novo. Our review is governed by the same standard used by the trial court under Fed.R.Civ.P. 56(c)." Coverdell v. Department of Social & Health Serv., 834 F.2d 758, 761 (9th Cir.1987) (citation omitted). The standard governing summary judgment in the district courts in libel actions brought by public figures was recently described by the Supreme Court in Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Where the factual dispute concerns actual malice ..., the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding ... that the plaintiff has shown actual malice by clear and convincing evidence...." Id. at 255-56, 106 S.Ct. at 2514.
 
 III.
 A. "Fictionalized" Quotations
 1. Legal Framework
 
 6
 Masson admits that he is a public figure and that he was constitutionally required to prove that Malcolm was motivated by actual malice. He contends he presented sufficient evidence of actual malice to defeat Malcolm's summary judgment motion. He argues that a jury could find actual malice by clear and convincing evidence based solely on the evidence he presented showing that Malcolm had deliberately "fabricat[ed] quotations ascribed to him." As evidence of such deliberate fabrication, Masson presented evidence that the several quotations attributed to him did not appear in the tape recordings of his conversations with Malcolm, that Malcolm herself had altered quotations, and that he had alerted staff at The New Yorker that the quotations had been altered prior to publication. For the purpose of this appeal, we assume the quotations were deliberately altered.
 
 
 7
 Neither the Supreme Court, nor this circuit, has had occasion to address the question whether a finding of malice may hinge upon evidence showing that a defamatory statement attributed to a person by using quotation marks does not contain his or her exact words. This question, however, has been addressed by several federal and state appellate courts.
 
 
 8
 In Dunn v. Gannett New York Newspapers, Inc., 833 F.2d 446 (3rd Cir.1987), the record showed that the Mayor of Elizabeth, New Jersey, in discussing his city's problems with litter, stated:
 
 
 9
 You have a lot of new people moving into the City of Elizabeth, some coming from foreign lands where abject poverty was something they lived with everyday and they have not yet been assimilated into our type of society, and it will take a great deal of time for some of them to respect the rights and the properties of other people, and above all, to respect a city that offers them a home in what I consider to be a wholesome environment.
 
 
 10
 Id. at 448. A Spanish-language newspaper summarized these comments in a headline which, when translated into English, read, "Elizabeth Mayor on the Attack: Calls Hispanics 'Pigs.' " Id.
 
 
 11
 The Mayor sued the newspaper for libel. He argued that the newspaper, "by enclosing 'cerdos' ['pigs'] in single quotation marks, purported to proclaim that the mayor had in fact used the word 'pigs' in discussing the litter problem." Id. at 450. He contended that the jury could find that the newspaper acted maliciously solely on the basis of evidence demonstrating that the "pigs" quote was fictionalized.
 
 
 12
 The district court in Dunn granted summary judgment to the newspaper finding the mayor "had failed to present clear and convincing evidence that the newspaper published the headline with actual malice." Id. at 449. The Third Circuit agreed. The Third Circuit held that "the headline was a rational interpretation of remarks that bristled with ambiguities." Id. at 452. "[W]e are convinced that the word [pigs] was a fair, albeit inadequate, translation of the relatively new additions to the American vocabulary of the words 'litter,' 'litterer,' or 'litterbug'...." Id.
 
 
 13
 In Hotchner v. Castillo-Puche, 551 F.2d 910 (2d Cir.), cert. denied sub nom. Hotchner v. Doubleday & Co., 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977), the evidence showed that the author of a book published in Spanish quoted author Ernest Hemingway as describing the public figure plaintiff as "dirty and a terrible ass-licker. There's something phony about him. I wouldn't sleep in the same room with him." Id. at 914. The publisher of the English-language edition of this book "toned down" this quotation, id. at 912; it quoted Hemingway as stating: "I don't really trust him [the plaintiff]...." Id.
 
 
 14
 The plaintiff sued for libel contending, inter alia, that the evidence it presented showing that the publisher "knowingly published a bowdlerized version of Hemingway's alleged statement" was sufficient to establish that the publisher acted maliciously. Id. at 914. The Second Circuit concluded in Hotchner that "[i]t is true that in transforming Hemingway's words to the much milder 'I don't trust him,' ... [the publisher] was fictionalizing to some extent. However, the change did not increase the defamatory impact or alter the substantive content of Hemingway's statement...." Id. Accordingly, "there was no evidence from which the jury might reasonably have found that the defendant published the alleged libels with knowledge of falsity or reckless disregard for truth." Id.
 
 
 15
 In Carson v. Allied News Co., 529 F.2d 206 (7th Cir.1976), a newspaper reporter wrote an article describing "in copious detail the supposed struggle between [Johnny] Carson and ... NBC executives wherein Carson was seeking to move the [Tonight] show [from New York to Hollywood] and NBC was resisting the move." Id. at 212. "The article contains supposed quotations by Carson to the executives and their responses and reactions." Id.
 
 
 16
 The plaintiff in Carson presented evidence showing that the reporter admitted he had "completely fabricated" the quotations attributed to the plaintiff. Id. Carson argued that malice could be inferred solely on the basis of this evidence. The district court disagreed and granted summary judgment to the defendants. Id. at 208.
 
 
 17
 In reversing the district court's order, the Seventh Circuit commented as follows:
 
 
 18
 In the catalogue of responsibilities of journalists ... must be a canon that a journalist does not invent quotations and attribute them to actual persons. If a writer can sit down in the quiet of his cubicle and create conversations as 'a logical extension of what must have gone on' and dispense this as news, it is difficult to perceive what First Amendment protection such fiction can claim....
 
 
 19
 Because of ... the wholly imagined but supposedly precisely quoted conversations regarding the purported struggle preceding the westward move of the Tonight Show, the plaintiffs are entitled to a jury's determination of whether actual malice existed.
 
 
 20
 Id. at 213.
 
 
 21
 In Bindrim v. Mitchell, 92 Cal.App.3d 61, 155 Cal.Rptr. 29, cert. denied, 444 U.S. 984, 100 S.Ct. 490, 62 L.Ed.2d 412 (1979), disapproved on other grounds, McCoy, 42 Cal.3d 835, at 846 n. 9, 727 P.2d 711, 231 Cal.Rptr. 518, an author, in an alleged novel, quoted an allegedly fictional psychiatrist as demanding, in a profane and insensitive manner, that a patient "drag" his wife to a "nude marathon." Id. 92 Cal.App.3d at 70-71, 155 Cal.Rptr. 29. The plaintiff, a psychologist who is a public figure, sued for libel claiming that book was actually about him, and that the defamatory quotations attributed to him were fictionalized. The plaintiff produced a tape recording of a therapy session which the author attended. The tape disclosed that the psychologist had merely suggested, in a non-profane and sensitive manner, that a patient bring his wife to a nude marathon. Id.
 
 
 22
 The jury found that the book was not fiction, that the quotations attributed to the psychologist were false and defamatory, and that the defendant published the quotations with actual malice. The defendant appealed, claiming, inter alia, that clear and convincing evidence did not support the jury's finding of malice. Id. at 72, 155 Cal.Rptr. 29. The California Court of Appeals disagreed and affirmed. The court's holding is contained in the following passage:
 
 
 23
 [The defendant's] reckless disregard for the truth was apparent from her knowledge of the truth of what transpired at the encounter, and the literary portrayals of that encounter[.] Since she attended sessions, there can be no suggestion that she did not know the true facts. Since 'actual malice' concentrates solely on defendants' attitude toward the truth or falsity of the material published, and not on malicious motives, certainly the defendant ... was in a position to know the truth or falsity of her own material, and the jury was entitled to find that her publication was in reckless disregard of that truth or with actual knowledge of falsity.
 
 
 24
 Id. at 72-73, 155 Cal.Rptr. 29 (citations omitted) (footnotes omitted).[1]
 
 
 25
 The state of the current law governing the defamatory nature of statements ostensibly ascribed to another person by the use of quotation marks can be summarized as follows: A factfinder may infer actual malice from a fabricated quotation when the language attributed to the plaintiff is wholly the product of the author's imagination. Carson, 529 F.2d at 213. An author may, however, under certain circumstances, fictionalize quotations "to some extent." Hotchner, 551 F.2d at 914; but see Bindrim, 92 Cal.App.3d at 70, 155 Cal.Rptr. at 34 (an author's privilege to alter quotations is not unlimited). Malice will not be inferred from evidence showing that the quoted language does not contain the exact words used by the plaintiff provided that the fabricated quotations are either "rational interpretations" of ambiguous remarks made by the public figure, Dunn, 833 F.2d at 452[2]; cf. Bose Corporation v. Consumers Union, 466 U.S. 485, 512-13, 104 S.Ct. 1949, 1965-66, 80 L.Ed.2d 502 (1984) (malice may not be inferred from inaccurate language chosen to describe an event where the description is " 'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' " (quoting Time, Inc. v. Pape, 401 U.S. 279, 290, 91 S.Ct. 633, 639, 28 L.Ed.2d 45 (1971)), or do not "alter the substantive content" of unambiguous remarks actually made by the public figure, Hotchner, 551 F.2d at 914.[3]
 
 
 26
 With these principles in mind, we turn to the question whether actual malice can be inferred from any of the quotations attributed to Masson.
 
 2. The Challenged Quotations
 
 27
 a. "It Sounded Better"
 
 
 28
 Malcolm quoted Masson as stating that he changed his middle name from Lloyd to Moussaieff because "it sounded better." This statement does not appear in tape-recorded interviews. On the tape recordings, Masson states that he changed his middle name to Moussaieff because, inter alia, he "just liked it."
 
 
 29
 The district court stated that it could "see little difference between Masson's own words and those attributed to him by Malcolm." Accordingly, the district court held that the evidence Masson presented showing a discrepancy between his statements on the tape and those attributed to him in the article was "not sufficient to raise a triable question of fact on the issue of actual malice."
 
 
 30
 We agree with the district court's observation. We cannot perceive any substantive difference between the phrases "it sounded better" and "[I] just liked it." Thus, although Malcolm did not quote Masson verbatum, the words attributed to him did not alter the substantive content of his statement. The district court did not err in granting summary judgment against Masson concerning the words "it sounded better."
 
 
 31
 b. "Intellectual Gigolo"
 
 
 32
 Malcolm quotes Masson as stating, in discussing an affair with a graduate student:
 
 
 33
 She [the graduate student] said, "Well, it is very nice sleeping with you in your room, but you're the kind of person who should never leave the room--you're just a social embarrassment anywhere else, though you do fine in your own room." And, you know, in their way, if not in so many words, Eissler and Anna Freud told me the same thing. They like me well enough "in my own room." They loved to hear from me what creeps and dolts analysts are. I was like an intellectual gigolo--you get your pleasure from him, but you don't take him out in public."
 
 
 34
 (emphasis added).
 
 
 35
 The italicized portion of the above quote is not in the tape-recordings. It does appear, however, in Malcolm's interview notes.
 
 
 36
 Masson contended below that both the quotation and Malcolm's notes were fabricated. The district court assumed for the purpose of disposing the summary judgment motion that Masson did not refer to himself as an intellectual gigolo. The district court noted, however, that the tape of this conversation contains the following comment:
 
 
 37
 [Eissler and Anna Freud] felt, in a sense, I [Masson] was a private asset but a public liability. They like me when I was alone in their living room, and I could talk and chat and tell them the truth about things and they would tell me. But that I was, in a sense, much too junior within the hierarchy of analysis, for these important training analysts to be caught dead with me.[4]
 
 
 38
 The court held that malice could not be inferred from the purported fabrication because Malcolm's "use of the descriptive term 'intellectual gigolo' was a rational interpretation of [these] ... comments." The district court opined further that "[t]he descriptive term 'intellectual gigolo,' as used in this context, simply means that Masson's views were privately entertaining, but publicly embarrassing to Freud and Eissler."
 
 
 39
 We believe that the district court accurately assessed Malcolm's interpretation of Masson's characterization of the views of Eissler and Anna Freud. While it may be true that Masson did not use the words "intellectual gigolo," Malcolm's interpretation did not alter the substantive content of Masson's description of himself as a "private asset but a public liability" to Eissler and Anna Freud. The district court did not err in determining that Masson did not prove by clear and convincing evidence that Malcolm acted with malice in attributing the words "intellectual gigolo" to Masson.
 
 
 40
 Moreover, the "intellectual gigolo" quotation is not defamatory. The dissent misreads the "intellectual gigolo" quotation interpreting it as containing Masson's assessment of himself. According to Judge Kozinski, "[f]or an academic to refer to himself as an intellectual gigolo is such a devastating admission of professional dishonesty that a jury could well conclude that it libelous." Dissent, at 1468. However, a fair reading of the quotation shows author Malcolm is portraying Masson as reporting Kurt Eissler's and Anna Freud's opinions about him. As such, it is difficult to perceive how the quotation is defamatory.
 
 
 41
 Additionally, the allegedly fabricated "intellectual gigolo" quote is non-defamatory under the "incremental harm branch" of the "libel-proof" doctrine. See Herbert v. Lando, 781 F.2d 298, 310-11 (2nd Cir.), cert. denied, 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 548 (1986). This doctrine measures the incremental reputational harm inflicted by the challenged statements beyond the harm imposed by the nonactionable remainder of the publication; if that "incremental harm" is determined to be nominal or nonexistent, the statements are dismissed as not actionable." Id. (citing Simmons Ford, Inc. v. Consumers Union, 516 F.Supp. 742 (S.D.N.Y.1981)).
 
 
 42
 In Herbert, the court held that two statements, which merely implied the same view and were simply an outgrowth of and subsidiary to statements on which it was held there could be no recovery, were not actionable even if the subsidiary statements were made with actual malice. Id. at 312.[5]
 
 
 43
 Given the general tenor of the article and the many provocative, bombastic statements indisputably made by Masson and quoted by Malcolm, the additional harm caused by the "intellectual gigolo" quote was nominal or nonexistent, rendering the defamation claim as to this quote nonactionable.
 
 
 44
 c. "Moral Cowardice"
 
 
 45
 Malcolm quoted Masson as stating that Freud's "entire theory after he abandoned seduction was the product of moral cowardice." The precise words used in this quotation do not appear in the tape-recorded interviews. The transcript of the taped conversations, however, contains the following statement. "I think ... [Freud] was a great and remarkable thinker but he was still a, a man who just lost his courage. He was a brilliant mind who didn't have the courage to stick with things that he knew were true."
 
 
 46
 We agree that the district court's conclusion that malice was not demonstrated by clear and convincing evidence by the purported fictionalization because Malcolm's "use of the descriptive phrase 'moral cowardice' was a rational interpretation of Masson's [acknowledged] comments." Masson's actual words show that he considered Freud to lack the courage of his convictions. In attributing the "moral cowardice" characterization of Sigmund Freud to Masson, Malcolm did not alter the substantive content of Masson's taped statement.
 
 
 47
 d. "Sex, Women, Fun"
 
 
 48
 Malcolm quotes Masson as stating that if he had been allowed to move into Anna Freud's house in London, the house not only would have been "a place of scholarship, but it would also have been a place of sex, women, fun." This statement does not appear in the tape recordings. Instead, Masson stated during a taped interview in discussing the changes he would make to Freud's home: "They're going to be calling the police on me every, every time I give a party or something"; and that "I could have had some fun." Masson also stated that:
 
 
 49
 it would take an Act of Congress then [sic] get me out of Anna Freud's house. But sooner or later, the, i--, there, there would have been, you know, just a rising, uh, tide of anger and resentment and people demanding my resignation. But the only person they could demand it of was me. And as long as I wanted to I could say, "Go to Hell."
 
 
 50
 The district court granted summary judgment to Malcolm on this claim because "the disputed passage was substantially true because the sting of the passage is the same as that of undisputed tape-recorded passages." Masson's taped comments show that he envisioned the Freud house as a site for wild parties. In discussing his personal life with Malcolm, he boasted of his sexual prowess. For example, he told Malcolm that he had slept with over 1,000 women before he became an analyst. Thus, the "sex, women, fun" quote is consistent with Masson's description of his life style and conception of "fun." The disputed quotation did not establish malice by clear and convincing evidence.
 
 
 51
 e. "Greatest Analyst Who Ever Lived"
 
 
 52
 Malcolm quotes Masson as predicting that after the release of his book analysts will say "after Freud, he's [Masson's] the greatest analyst who ever lived." This quotation does not appear in the taped interviews.
 
 
 53
 The tapes contain the following observations by Masson concerning his status as an analyst: "for better or for worse, analysis stands or falls with me now"; "it's me and Freud against the rest of the analytic world.... Not so, it's me. It's me alone"; and "[I] could single-handedly bring down the business [of Freudian psychology]." The district court held "[i]n light of the many egotistical and boastful statements that Masson made in tape-recorded comments ... plaintiff has not demonstrated clear and convincing evidence from which a reasonable jury could conclude that Malcolm entertained serious doubts about the accuracy of the passage."
 
 
 54
 We agree with the district court's construction of the words attributed to Masson. The purportedly fictionalized quotation actually reflects the substance of Masson's self-appraisal.
 
 
 55
 f. "Don't Know Why I Put It In"
 
 
 56
 Masson told Malcolm that he delivered a paper at an analyst's convention in which he criticized Freud for the alleged "sterility of psychoanalysis." Malcolm quoted Masson as stating to him: "That remark about the sterility of psychoanalysis was something I tacked on at the last minute, and it was totally gratuitous. I don't know why I put it in." This quotation does not appear in the tape recordings. However, Masson did state during a taped interview that he thought "the last sentence [of the paper blaming Freud for the sterility of psychology] was ... [a] possibly gratuitously offensive way to end a paper to a group of analysts." He also stated that he does "not know why psychoanalysis is sterile today."
 
 
 57
 The district court held that "[t]he passage as written is a rational interpretation of Masson's comments, including his characterization of the ... [sterility remark] as a gratuitously offensive way to end the paper." Our independent review of this claim compels us to reach the same conclusion. The district court correctly concluded that "[n]o reasonable juror could find that this passage provides clear and convincing evidence that Malcolm entertained serious doubts as to the truth of the statement." The words attributed to Masson did not alter the substantive content of his explanation of his evaluation of critical comments he selected to conclude his remarks to an audience of analysts.
 
 
 58
 g. The Schreber Case
 
 
 59
 Masson's next two claims relate to the discussion in the article about the Schreber case. Daniel Schreber was an Austrian jurist who was institutionalized at the turn of this century for mental illness. Schreber wrote a book detailing his various delusions. He explained that he had delusions concerning a "compression-of-the-chest," and that Paul Flechsig, his psychiatrist, wanted to castrate him.
 
 
 60
 Sigmund Freud conducted a case study on Schreber based on this book. This research formed the basis of Freud's theory on homosexuality. In the case study, Freud treated Schreber's delusions as products of fantasy.
 
 
 61
 In the 1950's, a well-known analyst named William Niederland investigated Freud's case study of Schreber. He discovered that Schreber's delusions were not entirely fantastical. Niederland discovered that Schreber's father was a tyrant. Schreber's "compression-of-the chest" delusion derived from his father's use of an invention called the "straightener" on him. This device compressed the chest with iron bars in a supposed effort to improve posture. Moreover, Niederland discovered that Schreber's psychiatrist performed experimental castrations on certain patients.
 
 
 62
 Masson also investigated Freud's case study of the Schreber case. Masson found a letter Freud had written prior to the publication of the case study which showed that he knew that Schreber's father was a tyrant. Masson also found an article among Freud's papers written by Flechsig describing his experimental castrations of hysterical and obsessional patients. Masson determined that Freud received a copy of this article prior to the publication of his case study on Schreber.1. "My Discovery"
 
 
 63
 In her publication, Malcolm quoted Masson as stating with respect to Freud's case study on Schreber:
 
 
 64
 It was the same thing with my discovery about the Schreber case. That was even more appalling. I found an 1884 article in Freud's library written by Paul Flechsig, Schreber's psychiatrist, which he [Flechsig] had personally sent to Freud; reporting that he performed castration experiments on hysterical and obsessional patients in his asylum. This means that when Freud wrote his essay on Schreber he knew that castrations had taken place in the asylum where Schreber was held, but he still could write that Schreber suffered from the delusion that the great Paul Flechsig wanted to castrate him.
 
 
 65
 The words "my discovery about the Schreber case" do not appear in the tape recordings. In a taped session, however, Masson describes Niederland's discovery about Schreber as follows:
 
 
 66
 I went a step beyond Niederland, but it was important.... [I discovered that] Freud has ... [Flechsig's] article [about experimental castrations] in off-print form in his library! [The article was sent to Freud] [f]rom Flechsig. So Freud knew when he was writing the Schreber case that Flechsig had performed castration!"
 
 
 67
 Masson contends that Malcolm fictionalized this quotation to make it appear that he was claiming credit for Niederland's initial discovery that Flechsig performed castrations. Masson notes that in the tape-recorded interview he emphasized that Niederland made this initial discovery and he had only taken it one step further.
 
 
 68
 The district court granted summary judgment to Malcolm with respect to this passage because it found that the "article makes clear the fact that the discovery Masson was claiming was that Flechsig had sent Freud the article and the article was in Freud's library." The district court held that "[n]o reasonable juror could find by clear and convincing evidence that Malcolm entertained serious doubts about the truth" of this passage, given the near identity between Masson's comments on tape and those attributed to him in the article.
 
 
 69
 The district court correctly analyzed this issue. The quotation attributed to Masson does not alter the substance of Masson's comments about his discovery of the Fleschig paper on castration experiments.
 
 
 70
 2. "Eissler Would Have Admitted I Was Right"
 
 
 71
 Malcolm quotes Masson as stating that "[Dr. Kurt] Eissler would have admitted ... [he] [Masson] was right" in his belief that Freud knew Schreber's concerns about castration had some basis in reality prior to his publication of the Schreber case study. This statement is not on any tape of Malcolm's conversations with Masson. The following conversation, however, does appear on tape:
 
 
 72
 MASSON: [Had Freud been honest about the Schreber case, he would have said] I have here in my library an article by Paul Flechsig, in which he recommends castration. Now, you may wonder whether this had anything to do with ... Schreber's delusions. My answer is: It did not.
 
 
 73
 MALCOLM: Uh huh.
 
 
 74
 MASSON: And it leaves the reader the opportunity to think about it by providing evidence he knew to be germane to the issue, but Freud doesn't do that.... I even wrote in my Schreber paper when I--the one that I met with Eissler over, I said, "I cannot believe that Freud knew the works of ... [Schreber's] father. I simply do not believe he knew them because if he did, he wouldn't be able theoretically to ignore this and--
 
 
 75
 MALCOLM: Yeah.
 
 
 76
 MASSON: Now, I know that's not true.
 
 
 77
 MALCOLM: So what did Eissler say then?
 
 
 78
 MASSON: He agrees with me, of course.
 
 
 79
 The latter portion of this passage is ambiguous. It is difficult to discern whether Masson is claiming that Eissler "agrees" with Masson's current belief that Freud knew that Flechsig performed castrations at the time he published his case study, or that Eissler "agrees" with the statement that Freud did not "know the works of the father" contained in Masson's paper on Schreber which was written prior to the discovery of Flechsig's article among Freud's papers."
 
 
 80
 The words ascribed to Masson that "Eissler would have admitted that I was right" were a rational interpretation of Masson's ambiguous remarks about Eissler's reaction to his discoveries about the Schreber case. The district court did not err in granting summary judgment to Malcolm concerning the quoted language.
 
 
 81
 h. "Denise Worries Too Much"
 
 
 82
 Malcolm quoted Masson's girlfriend Denise Cammell as complaining that Masson did not "feel the pain" that he had caused Dr. Eissler. Malcolm quotes Masson as responding, "Denise worries too much." Masson contends that Malcolm fabricated this response. The tape shows that Masson responded to Denise's complaint about his lack of feelings for Eissler by stating that he was not personally "close" to Eissler.
 
 
 83
 The district court held Masson failed to present "clear and convincing evidence that Malcolm entertained serious doubts about the truth" of the allegedly fictionalized response. The response Masson made to Denise's complaint, that he was not "close" to Eissler, can reasonably be read as non-responsive. The comment did not respond to Malcolm's statement regarding Denise's specific complaint about Masson's lack of feelings. Moreover, Masson admits that he told Malcolm that his girlfriend worried too much. Thus, the purported fictionalization "Denise worries too much" did not constitute a substantive alteration of the response Masson claims he made.
 
 B. "Misleadingly Edited" Quotations
 1. Applicable Principle
 
 84
 Masson contends that Malcolm took several statements he made out of context. He contends that a reasonable jury could find actual malice on Malcolm's part solely upon the evidence he presented showing that the article was edited misleadingly.
 
 
 85
 The Supreme Court has provided guidelines to assist courts in determining when actual malice may be inferred from evidence showing misleading editing. In Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), the defendant magazine published an account of a report by the United States Civil Rights Commission. The Civil Rights Commission's report detailed "the alleged facts in typical cases of police brutality," under a the preface providing that while "[i]n no case has the Commission determined conclusively whether [police brutality occurred] ... the allegations appeared substantial enough to justify discussion." Id. at 287, 91 S.Ct. at 638. One of the cases of brutality the report described was the "alleged" racially-motivated beating of an arrestee by a Chicago police officer named Pape. Id. at 281, 91 S.Ct. at 635.
 
 
 86
 In its article about police brutality, the magazine set forth a detailed description of the beating inflicted upon the arrestee by Officer Pape. The magazine article failed to mention, however, that the Civil Rights Commission had prefaced its description of this beating with the proviso that it was describing mere allegations of police brutality. Id. at 281-82, 91 S.Ct. at 635.
 
 
 87
 Pape sued claiming, inter alia, that actual malice on the part of the magazine could be inferred from its omission of the word "alleged" in the article. The Supreme Court disagreed. The Court held that the Civil Rights Commission's prefatory remarks about "allegations" "may fairly be characterized as extravagantly ambiguous." Id. at 287, 91 S.Ct. at 638. "[I]n context it was impossible to know whether the Commission was seeking to encourage belief or skepticism regarding the incidents about to be described." Id. at 288, 91 S.Ct. at 638. In light of this ambiguity, the Court held:
 
 
 88
 [The magazine's] omission of the word "alleged" amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of "malice...." To permit the malice issue to go to the jury because of the omission of a work like "alleged," despite the context of that word in the Commission Report ..., would be to impose a much stricter standard of liability on errors of interpretation or judgment than on errors of historic fact.
 
 
 89
 Id. at 290, 91 S.Ct. at 639.
 
 
 90
 We next consider whether, in light of the test set forth in Time, Inc. v. Pape, actual malice can be inferred from the passages which Masson contends were edited in a misleading manner.
 
 2. The Challenged Quotations
 
 91
 a. "Aren't Too Many Interpretations Possible"
 
 
 92
 Malcolm quotes Masson as stating that "[t]here aren't too many interpretations possible" of his discovery that Freud had knowledge that Flechsig performed castrations prior to the publication of the case study on Schreber. Masson complains that Malcolm took this statement out of context. He contends that he made this statement with reference to discoveries he had made showing that Freud abandoned the "seduction" theory for improper reasons.
 
 
 93
 Masson's "interpretations" comment appears in the following portion of the transcript of the taped interviews:
 
 
 94
 MALCOLM: [Eissler seemed to believe Freud's abandonment of] the seduction theory was, was correct. ....
 
 
 95
 MASSON: Yeah but if, I mean if he had let me talk to him long enough about all the new material, he would've had to share more or less my point of view.
 
 
 96
 MALCOLM: Um-hmm. You really think so?
 
 
 97
 MASSON: Oh yeah.
 
 
 98
 ....
 
 
 99
 MASSON: But it, yeah, but I don't think there are too many interpretations possible of this kind of material. You know it's just overwhelming the amount of, of information that's been suppressed and so on....
 
 
 100
 MALCOLM: Yeah, I see.
 
 
 101
 MASSON: You know and I think Eissler would have admitted that. I think if I had said to him: "Look, you know, I'm not going to ever say this, but just between you and me--," he would've said, "Yes, you're right, but never, never tell the goyim."
 
 
 102
 (emphasis added).
 
 
 103
 The district court held that "in light of the somewhat confusing references to 'discoveries' and 'new material' in the transcript, ... [Masson's] statements ... could reasonably be seen as pertaining, at least in part, to ... [Masson's] discovery about the Flechsig article." The district court held that "[t]he published passage was a rational interpretation" of Masson's taped comments. We have reached the same conclusion after our independent review of the taped conversation. It is unclear from the "interpretations" passage whether Masson's was referring to his discovery about Freud's possession of Flechsig's article, or other discoveries by Masson that supported his belief that Freud improperly abandoned the seduction theory. Malcolm's interpretation of Masson's comment was rational.
 
 
 104
 b. "He Had The Wrong Man"
 
 Malcolm quoted Masson as stating:
 
 105
 [Eissler] ... was always putting moral pressure on me [to keep silent about my discoveries about Freud]. "Do you want to poison Anna Freud's last days? Have you no heart? You're going to kill the poor old woman." I said to him, "What have I done? You're doing it. You're firing me. What am I supposed to do, be grateful to you?" "You could be silent about it. You could swallow it. I know it is painful for you. But you could just live with it in silence." "Why should I do that?" "Because it is the honorable thing to do." Well, he had the wrong man.
 
 
 106
 Masson's unedited remarks on the tape were as follows:
 
 
 107
 [Eissler] ... was constantly putting various kinds of moral pressure on me, and, "Do you want to poison Anna Freud's last days" "Have you no heart?" He called me up, "Have you no heart? Think of what she's done for you, and you are now willing to do this to her." I said, "What am I, What have I done? You're doing it, you're firing me. What am I supposed to do, thank you? Be grateful to you?" He said, "Well, you could never talk about it, you could be silent about it, you could swallow it. I know it's painful for you, but just live with it in silence." "Fuck you," I said, "Why should I do that Why? You know, why should one do that?" Because it's the honorable thing to do, and you will save face, and who knows, if you never speak about it and quietly and humbly accept our judgment, who knows in a few years if we don't bring you back? " Well, he had the wrong man.
 
 
 108
 (emphasis added).
 
 
 109
 Masson contends that Malcolm purposefully deleted the portion emphasized above to make it appear that he admitted that he "was the wrong man" to ask to do something honorable. He contends that the unedited passage reveals that he said only that he was the wrong man to keep silent for selfish reasons--to keep his future job prospects open.
 
 
 110
 Masson's statement that he "was the wrong man" is ambiguous. It is unclear whether he was declaring that he was the "wrong man" to keep silent for selfish purposes, or the "wrong man" to ask to do something honorable. The statement Malcolm ascribed to Masson was a rational interpretation of his ambiguous remarks.
 
 IV.
 
 111
 Masson contends that The New Yorker and Knopf are vicariously liable for Malcolm's actions in allegedly libeling him and placing him in a false light. Because we have concluded that Masson failed to present evidence sufficient to support a reasonable jury finding that Malcolm acted maliciously, the district court did not err in holding that The New Yorker and Knopf cannot be held liable for publishing the article and book.
 
 V.
 
 112
 The defendants contended in the district court that Masson's complaint, and his opposition to their summary judgment motion, lacked a reasonable basis in both fact and law. They moved for attorneys fees and costs under Fed.R.Civ.P. 11 and Cal.Code Civ.P. Sec. 1021.7 (West Supp.1988). Rule 11 provides that "the signature of an attorney or party [on a pleading, motion or other paper] constitutes a certificate by him ... that it is well grounded in fact and is warranted by existing law...." Cal.Code Civ.P. Sec. 1021.7 provides that "in an action for libel or slander ..., the court may, in its discretion, award reasonable attorney's fees to the defendant or defendants as part of the costs, upon a finding by the court that the action was not filed or maintained in good faith and with reasonable cause."
 
 
 113
 The district court did not issue explicit findings on the defendants' requests for costs and attorneys fees under Rule 11 and section 1021.7. The court simply ruled that "each side to bear their own attorney's fees and costs." In their cross-appellants' brief, the defendants contend that this court should remand this claim to the district court with directions that it make findings on their request for attorneys fees and costs.
 
 
 114
 This court has apparently not yet decided whether district courts must make explicit findings on a defendant's request for costs and attorneys fees under Rule 11. This issue, however, has been specifically addressed by the Fifth and Seventh and Tenth Circuits. The Fifth Circuit holds that findings are not required. See Thomas v. Capital Security Serv., 836 F.2d 866, 883 (5th Cir.1988) (en banc). The Seventh Circuit holds that findings are required unless "the motion for sanctions is foolish, or when the reasons for denying a colorable motion are apparent on the record." Szabo Food Serv., Inc. v. Canteen Corp., 823 F.2d 1073, 1084 (7th Cir.1987), cert. dismissed, --- U.S. ----, 108 S.Ct. 1101, 99 L.Ed.2d 229 (1988); see Brown v. Federation of State Medical Boards of the United States, 830 F.2d 1429, 1438 (7th Cir.1987). The Tenth Circuit mandates findings where the sanctions award has the effect of a preclusion of access to the courts. Cotner v. Hopkins, 795 F.2d 900, 903 (10th Cir.1986).
 
 
 115
 Neither this court, nor the California courts, have decided the specific question whether trial courts must make explicit findings on requests for attorneys fees under section 1021.7. However, this court has held that district courts must make findings on requests for attorneys fees under Cal.Civ.Proc.Code Sec. 1021.4, an attorney fees statute related to section 1021.7, in diversity actions arising under California law. Insurance Corp. of North America v. Moore, 783 F.2d 1326, 1328 (9th Cir.1986).
 
 
 116
 We need not decide whether the district court must make explicit findings in response to a motion under Rule 11 and section 1021.7. It is uncontroverted that Malcolm fictionalized certain quotations and attributed them to Masson. Given these uncontroverted facts, the only relevant question with respect to the Rule 11 and section 1021.7 motions is one of law: Could "a plausible, good faith argument ... be made by a competent attorney" that actual malice could be inferred from the evidence Masson presented showing that the quotes were fictionalized. Zaldivar v. Los Angeles, 780 F.2d 823, 833 (9th Cir.1986). This legal issue can be decided by this court. Cf. Zuniga v. United Can Co., 812 F.2d 443, 452 (9th Cir.1987) ("[i]f the legal conclusions of the district court that the facts constitute a violation of ... Rule is disputed, we review that legal conclusion de novo").
 
 
 117
 We believe Masson made a plausible, good faith argument that actual malice could be inferred from the evidence he presented demonstrating that quotations were fictionalized in the article. At the time of the filing of the complaint, the law in California and in this circuit was unclear whether actual malice can be inferred solely from proof that an author by using quotation marks ascribed to the plaintiff words that he did not speak. The district court did not err in refusing the defendants' request for attorneys fees and costs under Rule 11 and section 1021.7.
 
 
 118
 The defendants' request for sanctions is denied. Masson's post argument suggestion that we consider material not presented to the district court is denied.
 
 
 119
 The district court's order granting summary judgment to New Yorker is AFFIRMED.
 
 
 120
 KOZINSKI, Circuit Judge, dissenting.
 
 
 121
 The majority and I part company on a simple but fundamental point: the meaning of quotations. As I see it, when a writer uses quotation marks in reporting what someone else has said, she is representing that those are the speaker's own words or something very close to them. The majority views quotations much more amorphously: They are merely an extrapolation of the speaker's words, as interpreted in light of his background and character. Under the majority's approach, the resulting "quotation" may differ significantly in wording and content from what the speaker actually uttered, so long as the writer can argue with a straight face that it is a rational interpretation of what the speaker said. If the speaker is thereby made to sound stupid or arrogant, evil or insincere, the majority denies him a remedy.
 
 
 122
 While courts have a grave responsibility under the first amendment to safeguard freedom of the press, the right to deliberately alter quotations[1] is not, in my view, a concomitant of a free press. Neither the authorities on which the majority relies nor the applicable first amendment principles suggest otherwise. I must therefore respectfully dissent.
 
 
 123
 * A. This is a case of libel. Plaintiff Jeffrey M. Masson gave an extended interview to defendant Janet Malcolm, who was writing a story about Masson's stormy relationship with the Sigmund Freud Archives. All or substantial portions of that interview were tape-recorded. Masson now claims that Malcolm attributed to him a number of statements he never made and materially changed others so as to place him in a false and unfavorable light. He supports his claim with a detailed and articulate declaration; he also provides transcripts of the tapes and other collateral evidence, all of which seem to corroborate his claim.
 
 
 124
 There are, to be sure, many disputed facts: Malcolm claims that Masson made the statements in question precisely as she quoted them, albeit during interview sessions that were not tape-recorded. But, as the majority recognizes, the dispute must be resolved in Masson's favor in this appeal from a grant of summary judgment. We therefore start with the assumption that Malcolm altered Masson's statements as he claims she did.
 
 
 125
 Under the law of California, which we are bound to apply in this diversity case, attributing to Masson a statement he did not make can constitute libel. See Selleck v. Globe Int'l, Inc., 166 Cal.App.3d 1123, 1129, 212 Cal.Rptr. 838, 844 (1985). Indeed, in Bindrim v. Mitchell, 92 Cal.App.3d 61, 155 Cal.Rptr. 29, cert. denied, 444 U.S. 984, 100 S.Ct. 490, 62 L.Ed.2d 412 (1979), disapproved on other grounds, McCoy v. Hearst Corp., 42 Cal.3d 835, 846 n. 9, 727 P.2d 711, 719 n. 9, 231 Cal.Rptr. 518, 525-26 n. 9 (1986), on which the majority relies, the court sustained a libel verdict based in part on misquotations, even though the story purported to be fictional and the dialogue was nominally attributed to a character bearing a name different from the plaintiff's.
 
 
 126
 Nor is there any dispute as to the plaintiff's burden of proof. Masson readily concedes he is a public figure who must prove malice under New York Times, Inc. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). This means that Masson cannot recover for inadvertent, careless or even negligent alterations of his quotes. He can only recover if he shows that defendants deliberately changed his words or misquoted him recklessly. Id. at 279-80, 84 S.Ct. at 725-26. Masson claims he can do this; he asks for the opportunity to present his proof to a jury.
 
 
 127
 The majority holds, as a matter of law, that Masson cannot establish malice as to some of the challenged quotations because they did not alter the substance of his statements and, as to others, because they were rational interpretations of Masson's own ambiguous remarks. Majority op. at 1455-56. While both parts of this test are troublesome, the second is particularly so. An unqualified quotation attributed to a third party is commonly understood to contain no interpretation; by using quotation marks the writer warrants that she has interposed no editorial comment, has resolved no ambiguities, has added or detracted nothing of substance. As more fully discussed below, see 1473-78 infra, that is the prevailing view among journalists. It is also, I believe, the assumption made by most readers. Because quotations purport to come directly from the speaker--free of editorial comment by the writer--they can have a devastating rhetorical impact and thus carry a serious potential for harm.
 
 
 128
 We need not speculate; the record contains clear evidence on the subject. For example, a review of Malcolm's article in the Boston Globe by psychiatrist Robert Coles, a Harvard professor, contains the following appraisal of Masson, based on Malcolm's work:
 
 
 129
 Masson the promising psychoanalytic scholar emerges gradually, as a grandiose egotist--mean-spirited, self-serving, full of braggadocio, impossibly arrogant and, in the end, a self-destructive fool. But it is not Janet Malcolm who calls him such: his own words reveal this psychological profile--a self-portrait offered to us through the efforts of an observer and listener who is, surely, as wise as any in the psychoanalytic profession.
 
 
 130
 Coles, Freudianism and Its Malcontents, Boston Globe, May 27, 1984, at 58, 60 (emphasis added). And again, in a review of Masson's own book, reference is made to Malcolm's description of him, and particularly to the words he supposedly uttered:
 
 
 131
 ... Malcolm's portrait of Masson is devastating: largely through his own words he emerges as a feverish jumble of vanity, self-destruction, childishness, and ruthlessness.
 
 
 132
 Kirkus Reviews, Apr. 1, 1984, at 345 (emphasis added).
 
 
 133
 As these reviews indicate, and as common sense suggests, readers give far greater weight to direct quotations than to descriptions or paraphrases by the author. This is because quotations allow readers to draw their own conclusions about the speaker's character, motive, candor and lucidity.[2] Experienced writers are well aware of this phenomenon and frequently use quotations as proof--raw data to enhance the credibility of the narrative--as if to say: "See here, don't just take my word for it, he said it himself." An article devoid of such factual anchors, one that consists entirely of the author's own observations and conclusions, will generally leave readers dissatisfied and unpersuaded, as well as bored.
 
 
 134
 Because quotations possess an immediacy and resulting credibility often lacking in ordinary narrative prose, minor changes in quoted language can have a major effect on how a speaker is perceived. A skilled writer can shade a speaker's words in subtle ways that will color a reader's perception far more effectively and permanently than if the writer paraphrases or otherwise discloses her editorial role. For example, if Malcolm tells us "Masson thinks he is the greatest analyst who ever lived," we discount the statement somewhat, aware that it represents merely her own conclusion, filtered through her perception, biases and mode of expression. It is quite a different matter to read Masson as saying "I am the greatest analyst who ever lived." This shows him to be not only arrogant and conceited, but a braggart to boot. By putting the phrase into Masson's own mouth and concealing her role as interpreter and editor, Malcolm has caused Masson a serious injury and made it look like a self-inflicted wound. It is this concealment--the use of quotation marks to deceive the reader about the author's editorial role--that libel law prohibits and the Constitution does not, in my opinion, protect.
 
 
 135
 A close examination of this particular discrepancy, among a dozen or so of which Masson complains, shows the insidious way in which Malcolm is alleged to have manipulated Masson's words to place him in an unfavorable light. Malcolm quotes Masson as saying, "They [analysts] will want me back, they will say that Masson is a great scholar, a major analyst--after Freud, he's the greatest analyst who ever lived." Malcolm, Annals of Scholarship: Trouble in the Archives--II, The New Yorker, Dec. 12, 1983 (Malcolm II), at 60, 118. Anyone reading this self-appraisal would be hard pressed to avoid the conclusion that Masson is an egomaniac.
 
 
 136
 Masson denies making this statement and, for purposes of summary judgment, we must assume he never did. The district court nevertheless held that "[i]n light of the many egotistical and boastful statements that Masson made in tape-recorded comments ... plaintiff has not demonstrated clear and convincing evidence from which a reasonable jury could conclude that Malcolm entertained serious doubts about the accuracy of the passage." Majority op. at 1459. The majority agrees, noting that "[t]he purportedly fictionalized quotation actually reflects the substance of Masson's self-appraisal." Id. at 1459. This rationale is explosive. What the court is saying, in effect, is that if you make statements that could reasonably be construed as boastful or arrogant (or callous or stupid or reflecting any other trait of character or intellect) the reporter may attribute to you any other statement reflecting that same trait.
 
 
 137
 The enormous sweep of this principle can best be appreciated by comparing what Masson actually said with what Malcolm attributed to him. Masson's statements are materially different both in tone and content from what Malcolm reports him to have said; they are hardly the ravings of a lunatic. The majority, for example, relies on Masson's statement that "for better or for worse, analysis stands or falls with me now." Id. at 1459. Plucked out of context, this statement sounds like an egotistical self-appraisal of Masson's pivotal status in the profession. Context, however, makes it clear that Masson was not describing his own abilities but the materials he claims to have discovered. Indeed, when Malcolm challenged him by saying "Well that's a very grandiose thing to say," Masson responded, "Yeah, but it's got nothing to do with me. It's got to do with the things I discovered." Excerpt of Record (ER) at 128 (emphasis added). For Malcolm to have truncated Masson's actual statement and quoted it out of context ("analysis stands or falls with me now") would itself have violated professional standards.[3] But using this and other snatches as yarn from which to weave a wholly different statement to be passed off as a quote from Masson is a power few self-respecting journalists arrogate to themselves. See 1473-78 infra.
 
 
 138
 The majority also relies on Masson's statement that "it's me and Freud against the rest of the analytic world.... Not so, it's me. It's me alone." Supplemental Excerpt of Record (SER) at 38-39. Again, freed from context, this snippet seems to support the majority's conclusion that Masson thought himself the greatest analyst who ever lived. But context gives the statement a far different cast. Immediately before this paragraph, Masson says, "Talk to enough analysts and get them right down to those concrete issues and you watch how different it is from my position. It's utterly the opposite and that's finally what I realized, that I hold a position that no other analyst holds, including, alas, Freud." Id. at 38 (emphasis added). When read against this background, Masson's next statement, that "it's me and Freud against the rest of the analytic world.... Not so, it's me. It's me alone," sounds much less narcissistic: It's clear he's not talking about his preeminence in the profession, but about the fact that his position on a particular issue is shared by no one else. True, there is a healthy element of boasting in Masson's statement; people often take pride in holding unpopular positions. But that is a far cry from asserting that others will see him as "the greatest analyst who ever lived." At least, I respectfully submit, a jury could reasonably conclude that the two are materially different.[4]
 
 
 139
 Another example of how broadly the majority's rationale sweeps is its willingness to approve Malcolm's use of the loaded phrase "intellectual gigolo," majority op. at 1456-58, when Masson denies having so described himself. Like "greatest analyst who ever lived," "intellectual gigolo" is particularly damning because of its graphic imagery and the emotional impact it is likely to have on the reader. The majority is willing to say close enough, principally on the basis of Masson's statement that Kurt Eissler and Anna Freud viewed him as
 
 
 140
 a private asset but a public liability. They liked me when I was alone in their living room, and I could talk and chat and tell them the truth about things and they would tell me. But that I was, in a sense, much too junior within the hierarchy of analysis, for these important training analysts to be caught dead with me.
 
 
 141
 ER at 66 (emphasis added). The majority concludes that intellectual gigolo is a rational interpretation of these comments because "[t]he descriptive term 'intellectual gigolo,' as used in this context, simply means that Masson's views were privately entertaining, but publicly embarrassing to Freud and Eissler." Majority op. at 1457 (internal quotations omitted).
 
 
 142
 To reach this conclusion, the majority must give Malcolm the benefit of every doubt. In the first place, the majority accepts the most benign interpretation of gigolo, "a professional dancing partner or male escort." Webster's Ninth New Collegiate Dictionary 517 (1984) (definition 2). But a far more common definition of gigolo is "a man supported by a woman usu. in return for his attentions," id. (definition 1), or "[a] young man who is kept as a lover by a woman." American Heritage Dictionary of the English Language 556 (New College ed. 1969) (only definition).[5] Malcolm herself, during a deposition, testified that she construed gigolo as connoting "selling your sexual favors." SER at 61.
 
 
 143
 Fairly read, intellectual gigolo suggests someone who forsakes intellectual integrity in exchange for pecuniary or other gain. Certainly, a jury might so conclude. For an academic to refer to himself as an intellectual gigolo is such a devastating admission of professional dishonesty that a jury could well conclude that it is libelous. I can see no justification for giving this emotionally loaded term the most innocuous conceivable interpretation, an interpretation contrary to the one in fact intended by the author.[6]
 
 
 144
 Even accepting the majority's bland definition of "intellectual gigolo," I fail to see how the term can fairly be derived from Masson's actual statement. In the quoted passage, Masson discusses Eissler's and Anna Freud's attitude toward him; apparently they liked him personally but they thought him "too junior within the hierarchy of analysis" for them to be publicly associated with him. Being too junior to be taken seriously is quite different from being a public embarrassment; one suggests that Masson is a young man with potential, the other makes him out to be a clown.[7]
 
 
 145
 Yet another abuse condoned by the majority's analysis concerns the passage attributing to Masson the statement that, had he been allowed to move into Anna Freud's house in London, he would have made it "a place of sex, women, fun." Malcolm, Annals of Scholarship: Trouble in the Archives--I, The New Yorker, Dec. 5, 1983 (Malcolm I), at 59, 93. The majority justifies Malcolm's fabrication of this pat little phrase by quoting Masson's statements that "[t]hey're going to be calling the police on me every, every time I give a party or something," and that "I could have had some fun." Majority op. at 1458. These references support only use of the word "fun"; to justify the "sex" and "women," the majority digs far into Masson's past, noting that he had "boasted [to Malcolm] of his sexual prowess," and had "told Malcolm that he had slept with over 1,000 women before he became an analyst." Id. at 1458 (emphasis added).
 
 
 146
 The majority's reliance on this remote and inapposite remark, made by Masson during the course of an entirely unrelated conversation, demonstrates just how far afield a journalist may roam under the "rational interpretation" approach. To be sure, if one digs through the over one thousand pages of interview transcript, one occasionally finds the word sex; specifically, Masson did discuss his exploits as a young man, albeit with some remorse.[8] But what does that prove? In effect, the majority is saying that, because of his wayward youth, Masson is the kind of guy who probably would use the Freud house for "sex, women, fun," and therefore Malcolm was entitled to make him say so to the world. I respectfully suggest that if authors are given license to invent quotations on the basis of what they perceive to be a speaker's character, there are no words whatsoever that they cannot put into a subject's mouth. As more fully discussed below, see 1474-78 infra, that practice is roundly denounced by most journalists: "It is never justifiable for a journalist to make up quotations, however plausible or characteristic...." J.L. Hulteng, Playing it Straight: A Practical Discussion of the Ethical Principles of the American Society of Newspaper Editors 64 (1981).
 
 
 147
 Yet another abuse sanctioned by the majority is the passage which ends with the sentence "Well, he had the wrong man." See majority op. at 1462-63. Because the passage appears in the taped transcripts, we have a road map as to what Malcolm did: She deleted 33 words out of a 40-word sentence, utterly changing Masson's meaning so as to make him say the antithesis of what he actually said. In this passage, Masson reports a conversation with Eissler in which Eissler asks him to leave quietly. Masson asks the rhetorical question: "Why should I do that? Why? You know, why should one do that?" In the article, Malcolm has Masson responding to this question as follows: " 'Because it is the honorable thing to do.' Well, he had the wrong man." The meaning of this exchange is clear: Masson is supposedly saying that Eissler had the wrong man if he expected Masson to do something honorable. Masson's actual answer (with the deleted words emphasized) was quite a bit more elaborate: " 'Because it's the honorable thing to do, and you will save face, and who knows, if you never speak about it and quietly and humbly accept our judgment, who knows in a few years if we don't bring you back? ' Well, he had the wrong man." Masson was clearly saying that he is the wrong man to be bribed into silence by the hope that they would bring him back a few years later.
 
 
 148
 The contrast between the two statements could not be sharper. As reported by Malcolm, Masson portrays himself as a swine, boasting that he would never be swayed to do the right and honorable thing. Masson's unedited statement makes him sound more like a hero, someone willing to speak the unpleasant truth even if it damages his career. As more fully discussed below, the selective editing of quotations so as to radically alter their meaning is anathema among respectable journalists. See 1474-78 infra. The majority's willingness to approve Malcolm's alteration on the ground that she could reasonably have understood Masson to be calling himself a swine demonstrates that the majority's rationale has no meaningful bounds.
 
 
 149
 The examples I have given are illustrative; each of the other quotations of which Masson complains are also distorted to a greater or lesser extent.[9] In each case Malcolm has allegedly disregarded what Masson actually said, and substituted another phrase or series of phrases--frequently with the skilled hand of the experienced author[10]--to paint an image materially different from what Masson's own words would have conveyed. Cumulatively, these alleged fabrications fit into a pattern that makes Masson appear more arrogant, less sensitive, shallower, more self-aggrandizing, and less in touch with reality than he appears from his own statements. While Malcolm was entitled to draw such inferences on the basis of her interview and to so describe Masson, she was not entitled to manufacture support for her conclusion by putting words in his mouth. By so doing, she crossed the line between poetic license and license. The latter the first amendment does not protect.
 
 
 150
 B. The majority distills its legal standard from a series of cases, none of which supports its position. Dunn v. Gannett New York Newspapers, Inc., 833 F.2d 446 (3rd Cir.1987), which is the most analogous, involved a Spanish-language newspaper's story on the mayor's speech, delivered in English, about the problem of litter in minority communities. The newspaper's headline asserted that the mayor had used the term "cerdos," a word that means "pigs," in referring to Hispanics. The court found that "cerdos" was also a fair translation of litterbugs, a word with no exact Spanish equivalent. In ruling for the defendant, the Third Circuit noted that "a translation may not always reflect the nuances and subtleties of the original language. This is especially true in the present case, because it is not controverted that there is no exact Spanish word for litterer or litterbug." Id. at 452. Even then, the Third Circuit did not hold, as the majority does here, that the plaintiff could never prove malice; it merely held that, in light of the difficulties inherent in translation, "it was critical to the plaintiff's case that he meet this reality with countervailing factual evidence of actual malice. This he failed to do. In failing, he created no genuine issue of material fact." Id.
 
 
 151
 Judge Aldisert's carefully crafted opinion in Dunn provides scant support for the majority's conclusion in our case. The problems inherent in translating from one language to another don't exist when everyone is speaking English. Translation necessarily involves a judgment: The translator must select the foreign-language word that best corresponds to the English word the subject actually uttered; even more discretion is called for when no precise translation is possible. But no judgment is required in quoting an English-speaking person in English.
 
 
 152
 Insofar as Dunn is relevant, it supports Masson. Even in the peculiar situation involving the translation of a term that had no Spanish equivalent--a situation where the newspaper could not avoid exercising judgment--the Third Circuit allowed for the possibility that malice could be established by collateral evidence; it held only that malice could not be inferred from use of the term "cerdos" alone. Because "cerdos" was a fair translation of litterbugs, "it was critical to the plaintiff's case that he meet this reality with countervailing factual evidence of actual malice." Id. Plaintiff lost because he failed to present such additional evidence.
 
 
 153
 Here, there is a mountain of "countervailing factual evidence" tending to show malice: assurances Malcolm allegedly gave Masson that all quotes would be verbatim; the existence of tape recordings for many of the conversations; that Masson advised The New Yorker's fact-checkers that he was being misquoted; evidence that at least one of the quotations was changed, apparently in Malcolm's handwriting, to make it more bombastic but less accurate. See 1482-85 infra. Such evidence, absent in Dunn, could easily support a jury's determination that the alterations in Masson's quotations were deliberate or reckless, not merely careless, accidental or negligent.
 
 
 154
 Even less helpful to the majority than Dunn is the Second Circuit's opinion in Hotchner v. Castillo-Puche, 551 F.2d 910 (2d Cir.), cert. denied sub nom., Hotcher v. Doubleday & Co., 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977). Hotchner involved Castillo-Puche's memoir of his days with Ernest Hemingway. Plaintiff raised several claims of libel, one of which centered around a statement, attributed to Hemingway, that was graphically derogatory of the plaintiff. The court held that Doubleday & Co., which published the English translation of the book in question, could not be held liable because the "incident itself is believable and, as all the witnesses at trial agreed, the language used and sentiments expressed were not uncharacteristic of Hemingway." 551 F.2d at 914. Doubleday's editor verified the statement as best she could, asking the author (who claimed to have overheard the statements) to confirm his recollection of it. Id. Under those circumstances, the court held, there could be no malice. The court's rationale is instructive: "Where a passage is incapable of independent verification, and where there are no convincing indicia of unreliability, publication of the passage cannot constitute reckless disregard for truth." Id.
 
 
 155
 As an afterthought, Hotchner noted that Doubleday had fictionalized the passage somewhat by deleting the most graphic and stinging of Hemingway's remarks and replacing them with the bland "I don't trust him."[11] The court rejected the argument that this change in the language of the quotation could serve as a basis for a libel verdict: "[T]he change did not increase the defamatory impact or alter the substantive content of Hemingway's statement about Hotchner. If Doubleday could not have been liable for publishing the uncut version, it cannot be liable for deciding to make the passage less offensive to Hotchner." Id. (emphasis added).
 
 
 156
 I cannot, as the majority apparently does, read this passage for the proposition that a writer may alter quotes so as to make them defamatory and then attribute them to a third party with impunity. The Second Circuit held only that plaintiff could not base a claim on the changes in the Hemingway quote because the changes "did not increase the defamatory impact" of the quote. In relying on Hotchner, the majority makes far too much out of far too little.
 
 
 157
 Hotchner, however, is relevant and, like Dunn, helps Masson. It provides a fair and reasonable standard for evaluating a publisher's responsibility for defamatory quotations. As noted, the court held that Doubleday could not have been reckless as to the accuracy of the passage in question because (1) the incident was believable; (2) the passage sounded like Hemingway; (3) there were no convincing indicia of unreliability; and (4) the passage was incapable of independent verification. As more fully discussed below, the third and fourth of these factors cut very sharply against the defendants in this case. See 1482-86 infra. With tapes in hand and fact-checkers alerted to Masson's protestations that he had been misquoted, defendants had the means for verifying the accuracy of the quotations and the "convincing indicia of unreliability" that should have prompted them to do so. Applying Hotchner to this case leads precisely to the opposite conclusion from that reached by the majority.
 
 
 158
 The majority also relies on the Seventh Circuit's opinion in Carson v. Allied News Co., 529 F.2d 206 (7th Cir.1976), but as I read Carson, it is more accurately described as conflicting with today's ruling. Judge Sprecher's stern admonition to journalists ("In the catalogue of responsibilities of journalists, right next to plagiarism ... must be a canon that a journalist does not invent quotations and attribute them to actual persons," id. at 213) stands in stark contrast to the majority's benediction of the practice of fabricating and doctoring quotes. Malcolm here has admitted that a conversation she reported as having had with Masson did not occur at the time or place she indicated in her article. See Clerk's Record (CR) 95 at paragraphs 14, 15. Masson, in turn, claims that he never made the statements attributed to him during that mythical conversation. If Carson does not cover a situation where the journalist invents a conversation that never took place and reports words that the subject never uttered, I am not sure exactly what it does cover. As with Dunn and Hotchner, the majority avoids a circuit conflict only by drawing minute distinctions not supported by the rationale of the opinion or the facts of the case. Despite the majority's attempt to close ranks with our sister circuits, today's decision stands in conflict with that of every other circuit that has addressed the issue.
 
 
 159
 The majority also places oblique reliance on Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), and Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), principally for the proposition that "malice may not be inferred from inaccurate language chosen to describe an event where the description is ' "one of a number of possible rational interpretations" of an event "that bristled with ambiguities." ' " Majority op. at 1456 (quoting Bose, 466 U.S. at 512-13, 104 S.Ct. at 1966 (quoting Pape, 401 U.S. at 290, 91 S.Ct. at 639)). Bose and Pape are not on point; the language they employ is tantalizing but not germane. While Masson's meaning might have been ambiguous, there was no ambiguity as to what words he uttered. Had Malcolm sought to paraphrase Masson's statements and, in doing so, used inopportune language that changed the nuance of what Masson said, she would have fallen squarely under the protective umbrella of the first amendment. As Bose points out, a writer faced with the "descriptive challenges," 466 U.S. at 512, 104 S.Ct. at 1966, inherent in recounting an event should not be punished for the use of a malapropism "simply because an intelligent speaker would have to know that the term was inaccurate in context, even though he did not realize his folly at the time." Id. at 513, 104 S.Ct. at 1966.
 
 
 160
 A writer purporting to quote a third party faces no such interpretive challenges. By the use of quotation marks, she is representing that the choice of language was the speaker's, not her own. To be sure, plaintiff must still show that the writer was aware, or should well have been aware, that the quoted language was inaccurate. But making sure that quotations are accurate is a far simpler task than meeting the "descriptive challenges" a writer must face in supplying her own characterization. Writers purporting to attribute a quotation are not, in my view, entitled to the type of broad deference afforded by Bose to writers faced with describing an event "that bristle[s] with ambiguities." Id. at 512, 104 S.Ct. at 1966 (quoting Pape, 401 U.S. at 290, 91 S.Ct. at 639). The Supreme Court drew this distinction neatly in Pape:
 
 
 161
 A press report of what someone has said about an underlying event of news value can contain an almost infinite variety of shadings. Where the source of the news makes bald assertions of fact--such as that a policeman has arrested a certain man on a criminal charge--there may be no difficulty. But where the source itself has engaged in qualifying the information released, complexities ramify. Any departure from full direct quotation of the words of the source, with all its qualifying language, inevitably confronts the publisher with a set of choices.
 
 
 162
 401 U.S. at 286, 91 S.Ct. at 637 (emphasis added).
 
 
 163
 Although Pape permitted a news magazine to publish out-of-context quotations from a report of the Civil Rights Commission, it certainly did not purport to sanction the use of invented quotations. Selecting what portions of a text to excerpt involves an exercise of editorial judgment and Pape protects that judgment. But Pape does not hold that an author can invent or alter quotations so long as the doctored quotes are rational interpretations of what the subject said.
 
 
 164
 C. Because there are no cases precisely on point, I would start by examining the policies of the first amendment as interpreted by the Supreme Court in New York Times v. Sullivan and elsewhere. As I read Sullivan and its progeny, they are designed to achieve two closely related but distinct purposes. First, they protect journalists and publishers from liability based on errors of fact they might commit in doing their jobs honestly and professionally. The reason for this is simple: Newspapers and other media regularly digest a veritable avalanche of facts; these facts must be gathered from diverse sources, not all of equal reliability; judgments as to accuracy must often be made on the basis of incomplete information and under the pressure of a deadline. Newspapers might never be published if they were required to guarantee the accuracy of every reported fact; time and manpower do not permit the type of verification that would prevent all mistakes. To avoid the stifling effect of massive liability, the press is given wide berth on questions of fact; reporters are held liable only for deliberate falsehoods or where they act recklessly.
 
 
 165
 The second policy involves errors of judgment. Closely related to the decision of what facts to report is the decision of how to report them. Words are a writer's stock in trade and selecting the words used to describe a particular event is not always a precise science. Indeed, selection of words is recognized as an art--literature--and creativity in the use of language is an important value in a free society. The first amendment fully protects this prerogative of the author and publisher; they are not required to agonize over every word or worry whether some libelous inference might be distilled from it. Rather, if there is an ambiguity, the writer is entitled to exploit it to the fullest, selecting such language as fairly comports with a reasonable view of the matter, not necessarily the view that would please the source. That is the proposition for which I understand Bose and Pape to stand.
 
 
 166
 These two policies provide, quite properly, a wide arena for journalists to perform in. We recognize that, as a consequence, people may suffer uncompensated harm, but this is a cost we willingly assume in order to preserve a far higher value: a free and robust press.
 
 
 167
 The right to fabricate or alter quotations is different. It does not serve the policy of protecting the press from errors of fact. What someone says is a fact no less than what someone does. See Taylor, Holier Than Thou, New York Magazine, Mar. 27, 1989, at 35. The press is already protected from liability for inadvertent or negligent misquotations by the requirement that a libel plaintiff prove reckless or deliberate conduct. Thus, if a reporter takes notes and is unable to catch every word, she will be protected from liability even though she was negligent in failing to use a tape recorder or in double-checking her source. New York Times v. Sullivan's actual malice standard protects even the reporter who negligently misquotes a subject. Harte-Hanks Communications, Inc. v. Connaughton, --- U.S. ----, ----, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989).
 
 
 168
 The real question here is whether changing the language of quotations is the type of judgment that a reporter must be free to exercise in performing her duties. Or, put somewhat differently, is the right to doctor quotations important to the operation of a free and robust press? The majority implicitly holds that it is. The answer, I submit, is far more complex; the question bears close analysis. For guidance, I would rely not on what the defendants here tell us in seeking to avoid liability, but on what is said by working journalists outside the litigation context.
 
 
 169
 Whether, and under what circumstances, journalists may alter or invent quotations has been the subject of considerable soul-searching within the profession. The fundamental rule, widely accepted, is that "[q]uotation marks mean literally that the words they enclose are exactly as the source gave them--verbatim." M.V. Charnley & B. Charnley, Reporting 248 (4th ed. 1979). Accord The Associated Press Stylebook and Libel Manual 183 (1982) (direct quotations are used "[t]o surround the exact words of a speaker or writer when reported in a story"); J.L. Hulteng, The Messenger's Motives: Ethical Problems of the News Media 70 (1976) ("[m]ost of the newspaper codes or canons tend to stress literal accuracy when quoting news sources"). That is the standard to which The New Yorker aspires; according to William Shawn, editor-in-chief at the time Malcolm's article was published, "the New Yorker 'ideal is a verbatim quote'...." Lipman, At the New Yorker, Editor and a Writer Differ on the 'Facts', Wall St. J., June 18, 1984, at 1, col. 4.
 
 
 170
 Journalists have recognized, however, that "as a practical matter, it is not always possible for a reporter to be so literally accurate, unless there is a prepared manuscript, a trial transcript, or a tape recording to turn to." J.L. Hulteng, The Messenger's Motives, at 70. Accordingly,
 
 
 171
 some working conventions have been built into the journalist's ethic where quotations are concerned. Even if every syllable hasn't been captured as uttered, even if every article isn't exactly in place, the quote can still be considered an acceptably accurate one if it honestly reflects what the speaker said.
 
 
 172
 Id. at 70-71. See also J. Olen, Ethics in Journalism 100 (1988) ("Not to clean up quotes is to make intelligent speakers look stupid and stupid speakers look stupider."); S. Klaidman & T.L. Beauchamp, The Virtuous Journalist 50 (1987) ("standards can be set too high as well as too low").
 
 
 173
 Some reasons for failing to use verbatim quotes are relatively uncontroversial. Thus, the AP style manual advises that "[q]uotations normally should be corrected to avoid the errors in grammar and word usage that often occur unnoticed when someone is speaking but are embarrassing in print." Associated Press Stylebook at 184. Also, "[f]or those who must rely on written notes, there is the impossibility of getting all the words down, plus errors in note-taking and in deciphering hastily scribbled notes." J. Olen at 99.
 
 
 174
 Other types of changes are more controversial but, under appropriate circumstances, they are considered acceptable by many, but not all, journalists:
 
 
 175
 Deliberate improvements are often the result of compassion for the speaker. Many people speak less carefully than they write. They tend toward false starts, rambling and incomplete sentences, poor word choices, errors in agreement, and other infelicities that we are used to hearing but not reading. Thus, verbatim transcripts can prove an embarrassment to many speakers. Also, corrections, as well as condensations, can result from the reporter's desire to make the copy read better.
 
 
 176
 Id. Accord M.V. Charnley & B. Charnley at 248-50. Alterations of this type are not considered acceptable by everyone because they call for a judgment as to whether the speaker's meaning has been accurately preserved. Some authorities and publications therefore frown on the practice. M.V. Charnley & B. Charnley at 248; see 1478 infra. Even those who deem it acceptable do so only subject to an "essential qualification": The altered quote must "honestly reflect[ ] what the speaker said." J.L. Hulteng, The Messenger's Motives, at 71. The authorities are adamant and uniform in condemning the use of altered quotes that are not faithful to the meaning intended by the speaker:
 
 
 177
 No reporter has the right to manipulate the words of others so as to convey impressions that are distortions of the spirit of those words. You may misplace a comma or substitute one adjective for another and still not alter the thrust of a quote or paraphrase. But you have no license to violate the source's intent by changing the meaning of what he said, no matter what the motivation or temptation.
 
 
 178
 ....
 
 
 179
 ... The manipulation--or fabrication--of a quote in order to condition the reader's perception of a news figure or a news situation is a breach of journalistic ethics....
 
 
 180
 Absolute, literal accuracy can rarely be achieved, as we have noted earlier, but it is a firmly-rooted journalistic convention that the central meaning, the spirit, of a speaker's words must be truly conveyed.
 
 
 181
 Id.[12] See also J.L. Hulteng, Playing it Straight: A Practical Discussion of the Ethical Principles of the American Society of Newspaper Editors 64 (1981) ("Both the news source and the reader may be badly served unless the reporter operates with a surgeon's precision and with the fairest of motives.").
 
 
 182
 A more complex problem is presented when the story in question does not involve straight news reporting, but contains material of more lasting literary value, such as is frequently published by The New Yorker. A school of thought known as the New Journalism advances the view that an author has the right to vary or rearrange the facts of a story in order to advance a literary purpose.[13] This is a highly controversial view among journalists, one not shared by many who have spoken on the subject.[14]
 
 
 183
 The profession's attitude toward this practice is perhaps best illustrated by an incident, involving The New Yorker, that took place in mid-1984, just a few months after Malcolm's articles were published. In the June 18, 1984, issue of The Wall Street Journal, New Yorker writer Alistair Reid disclosed that he "regularly used composite characters, nonexistent settings, and invented dialogue in what were purported to be nonfiction articles." J. Olen at 82. Reid explained that "[i]n reporting with some accuracy, at times we have to go much further than the strictly factual.... Facts are part of the perceived whole." Dowd, A Writer for The New Yorker Says He Created Composites in Reports, N.Y. Times, June 19, 1984, at 1, col. 5. Reid also explained: "I would have 30 or 40 conversations with people and reflect their preoccupations.... If one followed them exactly, it would be terribly boring for the reader." Id. Reid claimed the right to manipulate the details of stories to get at a greater truth--the overall panoramic view that he wished his readers to experience.
 
 
 184
 The next day, The New York Times ran an editorial titled "The Fiction of Truth," criticizing Reid. The Times was perturbed that Reid had blurred the line between fact and fiction, to the ultimate detriment of the reading public and the journalistic profession:
 
 
 185
 [F]ictional speculation and factual reporting provide radically different reading experiences. Fiction thrills by analogy, by the knowledge that unreal events can illuminate truthfully. Nonfiction excites by experience, by extending a reader's knowledge of reality and quest for understanding. Why should not writers, like carnival barkers, pretend that fictions are facts? First, last and always, because the reader lured into the House of Facts, poor sap, has paid to experience facts. The tritest truth is that the truth is more than facts.... A fact is a true phenomenon; truth is the ideal explanation of a fact. That is not a particularly difficult distinction. Yet too many people find profit in blurring it. Some mongers of mere fact, notably salesmen and politicians, routinely pretend to be revealing truth. And some mongers of opinion, claiming like Mr. Reid to have hold of a singular truth, are openly contemptuous of fact. When either type shows up in our own ranks--or pages--we feel both cheated and devalued. Wrong truths are always correctable, with facts. Fictional facts are forever counterfeit.
 
 
 186
 The Fiction of Truth, N.Y. Times, June 20, 1984, at 26, col. 1. Accord Hersey at 20 ("In fiction, the writer's voice matters; in reporting, the writer's authority matters.... We read journalism ... to try to learn about the external world ... and the quality we most need in our informant is some measure of trustworthiness.").
 
 
 187
 In the days that followed, newspapers and magazines coast to coast carried the reactions of other journalists to the Reid disclosure, most of them negative. The New York Times quoted Fred Friendly, former president of CBS News and senior program adviser at the Columbia University Graduate School of Journalism, as saying "A composite is a euphemism for a lie.... It's disorderly.... It's dishonest, and it's not journalism." N.Y. Times, June 19, 1984, at 1, col. 5. Jack Beatty, senior editor of the Atlantic, when asked whether such practices were acceptable at his publication, replied, "No. Absolutely not. Our practice here is to check everything." Feeney, New Yorker Responds to Accuracy Issue, Boston Globe, June 20, 1984, at 44, col. 4 (emphasis original). Time magazine concluded that "Any departure from fact is the first step on a slippery slope toward unbelievability." McDowell, New Yorker Editor Calls Reporting Style Wrong, N.Y. Times, July 3, 1984, at C9, col. 1. James A. Michener, writing in the Los Angeles Times, expressed his respect for Reid but stated: "It is not healthy for a magazine to permit such deception, and if I were an editor I would try to prevent it." Id. The New York Times concluded that Reid's technique "would violate the practices of most respected newspapers and magazines." N.Y. Times, June 19, 1984, at 1, col. 5.
 
 
 188
 Some journalists were more sympathetic, but nevertheless criticized Reid because he had failed to disclose the practice to his readers, who were therefore misled. See, e.g., N.Y. Times, July 3, 1984, at C9, col. 1 (William F. Buckley, Jr.: "if that kind of thing is going on, somewhere along the line a reader should be tipped off"); N.Y. Times, June 19, 1984, at 1, col. 5 (Ken Auletta: "We shouldn't take shortcuts without telling the reader we're taking shortcuts, and by that I mean labeling it as fiction.").
 
 
 189
 While the Alistair Reid incident, and others like it,[15] have attracted a great many comments from the journalistic and publishing professions, the most telling reaction was that of The New Yorker itself. At first, editor-in-chief William Shawn defended Reid.[16] Perhaps in response to the storm of criticism, on June 29, 1984, Shawn did an about-face, circulating a memorandum to The New Yorker staff condemning Reid's actions:
 
 
 190
 "While he says he did not intend to deceive anyone, he violated New Yorker principles. He made a journalistic mistake. He was wrong. The editors of The New Yorker do not condone what he did.
 
 
 191
 "We have eight people in our Checking Department who spend their days and, if need be, their nights rigorously verifying every checkable fact before it goes into the magazine. Every writer is held to the same severe standards of factuality. Errors still occur, but they are inadvertent and rare.
 
 
 192
 "The New Yorker has devoted itself for fifty-nine years not only to fact and literal accuracy but to truth. And truth begins, journalistically, with the facts."
 
 
 193
 N.Y. Times, July 3, 1984, at C9, col. 1. Shawn also included the following exhortation in his memorandum:
 
 
 194
 "We do not permit composites.
 
 
 195
 "We do not rearrange events.
 
 
 196
 "We do not create conversations."
 
 
 197
 Id. (emphasis added).
 
 
 198
 The controversy surrounding the Reid disclosure is instructive. First, it points to the great resistance on the part of journalists and publishers to the blurring of fact and fiction. While it is recognized that many journalists do it, see Turovsky, Did He Really Say That?, Colum. Journalism Rev., July-Aug. 1980, at 38-39, the practice is widely condemned by those who have given the subject thoughtful consideration.
 
 
 199
 Moreover, what Reid was criticized for doing pales by comparison to Malcolm's alleged transgression. Reid rearranged events, created fictional characters and invented quotations, as a literary device, a way of getting his point across more effectively. But the quotations he invented or modified were not attributed to specific, identifiable people; they were attributed to such literary fictions as a taxi driver, people in a bar, an unnamed friend attending a college graduation. Reid used these fictional characters to better convey his own ideas; he did not put words into the mouths of real, flesh and blood individuals with reputations to be tarnished. The criticisms leveled at Reid must fall far more harshly on a journalist who deliberately twists the words of real, named individuals she purports to be quoting.[17] While I cannot claim to have made an exhaustive survey of the relevant literature, the materials I have examined--and there are quite a few of them--contain not a single instance where a journalist asserted the right to distort quotes of real, identified people. I find it difficult to conclude, therefore, that the right to do so is important to the proper functioning of the press in a free society.
 
 
 200
 To be sure, the inability to modify quotes places a significant constraint on writers, but it is one that responsible journalists seem to accept willingly. Professor Olen makes the point bluntly: "If the speaker's actual words are completely unusable, even with a little help, the reporter can always resort to indirect quotation or a combination of indirect and direct, putting quotation marks around only usable phrases." J. Olen at 100-01. The point is made even more forcefully in the April 13, 1984, issue of Winners & Sinners, an internal "bulletin of second-guessing issued occasionally from the news desk of The New York Times":
 
 
 201
 When is a quote not a quote? "That was a center of world terror that doesn't exist anymore," we quoted Ariel Sharon as having said of southern Lebanon (Feb. 26). But what he said--and what the reporter filed--was less succinct: "That was a center of world terror; that center of world terror doesn't exist anymore." Scant difference in meaning, but a larger difference ethically: Quotation marks guarantee the reader that we're transmitting the subject's words, literally. If the speaker isn't terse enough to suit us, we can tidy up the prose--but only after removing the quotation marks.
 
 
 202
 Tone of the Times, Winners & Sinners, Apr. 13, 1984, at 1 (emphasis original).
 
 
 203
 The standards and aspirations of the profession are not, of course, dispositive of the legal question before us.[18] Harte-Hanks Communications, Inc. v. Connaughton, --- U.S. ----, ----, 109 S.Ct. 2678, 2685, 105 L.Ed.2d 562 (1989). But our ruling rests on constitutional grounds; it limits the operation of state libel law in order to preserve the higher values protected by the first amendment. Unlike my colleagues, I am unable to construe the first amendment as granting journalists a privilege to engage in practices they themselves frown upon, practices one of our defendants has flatly disowned as journalistic heresy. See p. 1477 supra. The press can legitimately claim the right to editorial judgment when it is selecting the words itself; it cannot, and does not, claim the right to select words for others.
 
 II
 
 204
 Unlike the majority, I would start with the proposition that what somebody says is a fact, and that doctoring a quotation is no more protected by the first amendment than is any other falsification. In resolving a case such as this I would therefore engage in a five-step inquiry: (1) Does the quoted material purport to be a verbatim repetition of what the speaker said? (2) If so, is it inaccurate? (3) If so, is the inaccuracy material? (4) If so, is the inaccuracy defamatory? (5) If so, is the inaccuracy a result of malice, i.e., is it a fabrication or was it committed in reckless disregard of the truth? If the answer to any of these questions is no as a matter of law, the inquiry stops and the defendant wins. If they could all be answered yes, I would send the matter to the jury. Tested under this standard, the summary judgment granted by the district court in favor of defendants must be reversed.
 
 
 205
 (1) Does the Quoted Material Purport to be a Verbatim Rendition of what Masson Said?
 
 
 206
 While putting a statement in quotes normally indicates that it is precisely what the speaker said, that is not always the proper inference. For example, in Baker v. Los Angeles Herald Examiner, 42 Cal.3d 254, 721 P.2d 87, 228 Cal.Rptr. 206 (1986), cert. denied, 479 U.S. 1032, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987), the defendant newspaper published codefendant Bunzel's review of a television documentary on sexual education produced by plaintiff. The review contained the following passage:
 
 
 207
 "My impression is that executive producer Walt Baker, who is also vice president in charge of programs for Channel 9, told his writer/producer, Phil Reeder, 'We've got a hot potato here--let's pour on titillating innuendo and as much bare flesh as we can get away with. Viewers will eat it up!' "
 
 
 208
 42 Cal.3d at 258, 721 P.2d at 89, 228 Cal.Rptr. at 208. The California Supreme Court held that, even though Bunzel used quotation marks, he was not in fact purporting to quote Baker:
 
 
 209
 Nowhere is it asserted as a fact that Baker made the disputed statement. Instead, Bunzel explicitly qualified the disputed statement by warning the reader that he was not reporting a fact but only giving his "impression." By employing that term, Bunzel made it clear that he intended only to convey his opinion about what Baker might have said to his writer/producer.
 
 
 210
 42 Cal.3d at 263, 721 P.2d at 92, 228 Cal.Rptr. at 211.
 
 
 211
 Baker provides merely one example of how a writer may diffuse the inference that the material in quotes purports to repeat precisely what the speaker said. There are many others.[19] The issue, as in Baker, is whether the reader is expected to understand that the quote is verbatim, a paraphrase or merely a rhetorical device.
 
 
 212
 The record here presents substantial evidence supporting the view that Malcolm uses quotation marks to indicate that she is reporting precisely what various speakers, including Masson, said. Unlike the reviewer in Baker, Malcolm does not use the quotation marks as a rhetorical device to emphasize her message; there is no cautionary language to put readers on notice that she is relating a "hypothetical conversation," 42 Cal.3d at 264, 721 P.2d at 93, 228 Cal.Rptr. at 211, or a fictionalized account of Masson's life told in the first person. Statements are attributed directly to him and to others without any indication that they had been materially edited, stylized or otherwise altered. The two long New Yorker articles purport to present a serious report of an academic debate in the psychoanalytic community; they contain absolutely nothing that would counsel the reader to doubt that Masson said precisely what Malcolm quotes him as saying. Cf. Baker, 42 Cal.3d at 260, 721 P.2d at 90, 228 Cal.Rptr. at 209. Finally, there is "The New Yorker's vaunted reputation for accuracy," T. Goldstein at 206, and the public statements made by its editors reinforcing their commitment to this principle. See p. 1485 infra. There is thus much in the record to support the view that The New Yorker's readers would understand a quote to be a quote.
 
 
 213
 Masson's case is far more like Selleck v. Globe Int'l, Inc., 166 Cal.App.3d 1123, 212 Cal.Rptr. 838 (1985), which held that a magazine's false attribution to actor Tom Selleck's father of statements about his son's love life could support a cause of action for libel. The court noted that the article did "not merely express defendant's opinion that plaintiff made statements about his son. Rather, [it] assert[ed] as a fact that plaintiff made the statements." Id. at 1133, 212 Cal.Rptr. at 845. Like the article about Robert Selleck, Malcolm's articles gave the clear impression that the subject had made the statements in the course of interviews with the reporter.
 
 
 214
 (2) Are the Quotes Inaccurate?
 
 
 215
 Where, as here, an interview is on tape, ascertaining whether a quotation is inaccurate involves a straightforward comparison between what the speaker said and what he is reported as having said. But, as Dunn demonstrates, occasionally even this inquiry may be fraught with difficulty. Where, for example, a translation is involved, or where the speaker's statement is partially inaudible, the writer may have to make a judgment as to what the speaker actually said. If such judgment is required, the writer's choice must be respected, absent a showing of deliberate or reckless fabrication.
 
 
 216
 There is no claim here that Masson's statements were inaudible, or that they were made in a language other than English. No judgment was therefore called for in determining what Masson actually said. Because what Masson was quoted as saying is alleged to differ from what he actually said, I would move on to the next inquiry.
 
 
 217
 (3) Are the Inaccuracies Material?
 
 
 218
 One need only read a few trial transcripts to realize that the way most people talk is not particularly suitable for publication. There are many fragments and other grammatical abuses; the speaker will often say "uh" and "ah" and "you know"; occasionally he will make a false start and go back and correct himself; he may introduce irrelevancies and go off on tangents. A conscientious reporter will try to fix some of these problems, both to make a more readable story and keep the speaker from looking foolish. Turovsky, Did He Really Say That?, Colum. Journalism Rev., July-Aug. 1980, at 39. Such cosmetic changes are not actionable because they are not material. They delete or correct matters that do not go to the substance of what the speaker has said and are irrelevant to the content of his communication.
 
 
 219
 None of the changes Masson complains of fit into this category. If we compare Masson's version of what he said with what Malcolm quotes him as saying, it is clear that Malcolm's alterations are designed to do more than clean up peripheral aspects of Masson's language; they completely rephrase his statements or, in some instances, invent them out of whole cloth.
 
 
 220
 For example, the article quotes Masson as saying that Freud's "entire theory after he abandoned seduction was the product of moral cowardice...." Malcolm II at 109. Masson, however, is taped as having said: "I think [Freud] was a great and remarkable thinker but he was still a, a, a man who just lost his courage.... He was a brilliant mind who didn't have the courage to stick with things that he knew were true." Transcript of the Masson/Malcolm Tapes, vol. 1, part 1, at M110. While the two statements say generally the same thing, they are not the same. The quoted statement introduces "moral cowardice," a different, and arguably stronger, term than "didn't have the courage." Moreover, the quoted statement deletes Masson's tribute to Freud as "a great and remarkable thinker" and "a brilliant mind." As a consequence of these changes, Masson is made to sound far more disdainful of Freud than he actually was. While the statement, as altered, may or may not be libelous (the subject of the next inquiry), it is difficult to say that the changes were merely cosmetic or immaterial.[20]
 
 
 221
 (4) Were the Alterations Defamatory?
 
 
 222
 Under California law, "[l]ibel is a false and unprivileged publication by writing, printing, ... which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Cal.Civ.Code Sec. 45 (West 1982). The scope of libel under section 45 is construed broadly to encompass language having the natural tendency to injure reputation. Moore v. Greene, 431 F.2d 584, 592 (9th Cir.1970). Our inquiry here is whether the falsehoods in Malcolm's articles "cast [Masson] in a disparaging light since they portray his language and conduct as crude, aggressive, and unprofessional." Bindrim v. Mitchell, 92 Cal.App.3d 61, 77, 155 Cal.Rptr. 29, 38 (1979).
 
 
 223
 As discussed above, and as the majority seems to concede, California law recognizes a cause of action for libel on the basis of misquotations that have the same damaging effect as defamatory statements. Baker, 42 Cal.3d at 261, 721 P.2d at 91, 228 Cal.Rptr. at 210; Selleck, 166 Cal.App.3d at 1132, 212 Cal.Rptr. at 844. At least some of the misquotations, if proved at trial, would support a jury verdict for the plaintiff. See 1466-70 supra.
 
 
 224
 Some of the other allegedly altered quotations would probably not be defamatory, at least standing alone, e.g. "it sounded better" and "Denise worries too much." However, the various misquotations do not stand alone; they reinforce each other. Together they help paint Masson as a vain, shallow, disingenuous, intellectually dishonest, cold, heartless, self-absorbed individual. The tapes, containing Masson's own words, paint a different picture. Or so a jury could reasonably conclude.
 
 
 225
 The majority relies on Herbert v. Lando, 781 F.2d 298 (2d Cir.), cert. denied, 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986), to support its conclusion that the "intellectual gigolo" quote in particular is not defamatory. Majority op. at 1457-58. This reliance (on a case and a doctrine mentioned by neither party) is troubling for a number of reasons. For starters, while the first amendment limits the class of defamatory statements that can give rise to a cause of action for libel, whether or not a statement is defamatory in the first place is an issue of state law. The majority cites no California authority; Herbert 's "incremental harm" doctrine, as far as I can tell, has never been adopted as the law of California. In fact, the law of California leans in the opposite direction: In order to determine whether a statement is one of fact, which is actionable, or opinion, which is not, "[t]he publication in question must be considered in its entirety; it may not be divided into segments and each portion treated as a separate unit." Baker, 42 Cal.3d at 261, 721 P.2d at 91, 228 Cal.Rptr. at 209 (brackets and internal quotation marks omitted). To the extent the majority seeks to graft Herbert onto California defamation law, it fails to reconcile the apparent conflict with the state supreme court's opinion in Baker.
 
 
 226
 Second, the majority fundamentally misreads Herbert. Herbert scrupulously avoids holding that if incremental harm above nonactionable portions of a publication is only minimal, then the plaintiff cannot recover as a matter of law. Judge Kaufman discusses the doctrine (which he finds only in district court cases), but then explicitly refrains from applying it: "We believe, however, a reasoned and different ground exists in this case...." Herbert, 781 F.2d at 311 (emphasis added). The holding of Herbert is in fact very different, and quite unexceptional: The court concludes that if the defendants' published view that Herbert lied about reporting war crimes is not actionable, then other statements merely implying the identical view are not actionable either. Id. at 312. This is a far cry from saying, as does the majority, that any statement in a publication cannot be defamatory if the publication already contains a statement that is equally defamatory but unactionable, even if on an entirely different subject.
 
 
 227
 In fact, the incremental harm doctrine has never before been adopted by any federal appellate court. It has been explicitly and convincingly rejected by the D.C. Circuit, which noted that "[e]ven the public outcast's remaining good reputation, limited in scope though it may be, is not inconsequential." Liberty Lobby, Inc. v. Anderson, 746 F.2d 1563, 1568 (D.C.Cir.1984) (Scalia, J.), rev'd on other grounds, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The majority advances no rationale as to why we should breathe life into this stillborn doctrine.[21]
 
 
 228
 Finally, the majority's reasoning fails on its own terms: Even if we assume California would adopt the majority's incremental harm doctrine, we would be unable to find the "intellectual gigolo" quotation, or any of the others, nondefamatory as a matter of law. The majority finds "intellectual gigolo" (and by implication the other quotes at issue) no more defamatory than "the many provocative, bombastic statements indisputably made by Masson." Majority op. at 1458. But the majority does not tell us which statements it is referring to. Fact is, the most "provocative, bombastic statements" attributed to Masson are the ones Masson disputes having made. The majority has pointed to not a single statement out of the 1056 page Masson/Malcolm interview that is so outrageous as to render the expression "intellectual gigolo" trivial by comparison. I believe there are none.[22]
 
 
 229
 (5) Were the Alterations the Result of Malice?
 
 
 230
 Having determined that Malcolm's alterations of Masson's statements were intended to be read as direct quotations, that Malcolm was not required to exercise judgment, that the alterations were material and that they were potentially libelous, I would then turn to the question of malice. Because I view quotations as facts, not opinion, I would ask a simple question: Did the defendants know that Masson's actual statements differed from those attributed to him or did they act with reckless disregard with respect thereto? More precisely at this stage of the proceedings, I would ask whether the plaintiff has proffered sufficient evidence to allow a rational jury to so conclude. Because each defendant stands on a somewhat different footing, I will discuss them separately.
 
 
 231
 (a) Janet Malcolm
 
 
 232
 The circumstantial evidence that defendant Janet Malcolm acted with malice, deliberately or recklessly altering Masson's statements, is very strong indeed. In the first place, Malcolm had in her possession tapes of many hours of interviews at the time she prepared the article. Many of the passages she attributes to Masson bear a striking resemblance to taped passages, except that key words are changed, added or deleted. This alone raises a strong inference that Malcolm took liberties with Masson's quotes. At the very least, it suggests that she quoted from memory or from handwritten notes and then neglected to verify the accuracy of the quotes against the tapes.[23] It is significant in this regard that Malcolm was not working under a tight deadline. She had the luxury of drafting and editing her document at leisure; she apparently had a chance to review galley proofs. There is no suggestion that The New Yorker tore the manuscript out of her hands before she could verify its accuracy.
 
 
 233
 The record also contains at least one piece of direct evidence that Malcolm engaged in deliberate fabrication. Discussing his plans for Anna Freud's house, Masson said, "it's dark and somber and nothing went on in there. Boy, I was going to renovate it and open it up, and the sun would come in and there would be people and--Well, that's what it needs, but it is an incredible storehouse. I mean the library...." ER at 122. Malcolm's typed draft reads, "Sun would have come pouring in, people would have come, there would have been parties and laughter and fun." ER at 117. This sentence is crossed out, and the following sentence, to which Masson takes exception, is handwritten above it: "Maresfield Gardens would have been a center of scholarship, but it would also have been a place of sex, women, fun." Id. Since the alteration departs from Masson's statement even more than Malcolm's original version, the jury could easily infer that Malcolm made the change in a deliberate effort to distort what Masson said or with reckless disregard to whether it accurately reflected Masson's words. More broadly, the jury might infer that Malcolm considered Masson's quotes a proper subject for substantive editing, and that she did not feel constrained to quote accurately what Masson actually said.
 
 
 234
 Other, somewhat less compelling, indicia of malice round out the picture. For example, in her article Malcolm attributes certain of Masson's statements to a telephone conversation. Malcolm II at 117-18. She now claims that those statements were, in fact, made while Masson visited her in May 1983, at a time when her tape recorder was broken. Her inconsistency might be viewed as poetic license, but it might also be taken as proof of deliberate fabrication. The jury might also find it significant that Malcolm represented to William Shawn, editor-in-chief of The New Yorker, that every quote from Masson was on tape, CR 101 at exhibit 14; she repeated the assertion in a letter to The New York Times. N.Y. Times Book Review, July 8, 1984, at 33, col. 1. She now takes the position that some of the conversations were not recorded and that she took notes. A jury might well conclude that Malcolm's representation to her publisher that "everything was on tape," and her public reiteration of that statement, were accurate and that her more recent claim that there were conversations not on tape is a fabrication.
 
 
 235
 Finally, Masson claims that Malcolm made affirmative representations to him about the accuracy of his quotations. According to Masson, Malcolm asked him whether she could tape record the interviews and "explained that this would be to [Masson's] advantage, since it would mean there would be no misquotations." CR 100 at 2. Also according to Masson, "[a]t several points throughout our interviews, I told her I was concerned that she quote me accurately. She said that she had it all on tape, and I was not to worry since all quotations would be verbatim." Id. at 2-3. See also id. at 5 ("Malcolm repeatedly assured me that the quotations ascribed to me would be absolutely accurate, verbatim quotations, since they would come directly from her tapes."). Should the jury believe Masson, they could view this as a significant indication of malice. First, they could consider it as proof that Malcolm intended to deceive Masson about her intentions with respect to the quotes. Also, if Malcolm warranted to Masson that she would take all quotes verbatim off the tapes, I should think it would be at least reckless of her not to use the tapes to verify the accuracy of the quotes she used.
 
 
 236
 The jury may, of course, disbelieve Masson's account of many of these disputed facts. Or, it may decide that, under all the circumstances, Malcolm was merely careless, not deliberate or reckless. But a jury might well come to a more sinister conclusion. I respectfully suggest that were a jury to do so on this record, we would exceed our authority in saying that they were wrong.
 
 
 237
 (b) The New Yorker
 
 
 238
 Even if Janet Malcolm were found to have acted with malice, it would not necessarily follow that The New Yorker did as well. Because Malcolm is claimed to be an independent contractor, not an employee, her state of mind would not necessarily be attributed to the magazine.[24] The publication is not totally absolved from liability, however; the question is whether, given what it knew or should have known, it acted deliberately or with reckless disregard of the truth.
 
 
 239
 There is nothing on this record to suggest that The New Yorker was guilty of deliberate fabrication, except insofar as it might have knowingly approved Malcolm's alterations. See n. 26 infra and accompanying text. However, there is plenty of evidence of recklessness.
 
 
 240
 First, Masson alleges that he brought the inaccuracy of the quotations to the attention of Nancy Franklin, a member of The New Yorker' § fact-checking department. CR 100 at 6. According to Masson, "I asked her if it would be possible for her to read back all the quotations ascribed to me, since we were finding so many errors in the few passages she asked me about. She said this was not possible, but that I was not to worry, there were tape-recordings of all the conversations, and they would be verbatim and accurate." Id. at 6-7.[25] At Masson's insistence, Franklin promised to check with Malcolm about the possibility of having all the quotes read to him; Franklin promised to get back to Masson on the matter, but she never did. Id. at 7.[26]
 
 
 241
 Masson's conversation with Franklin should have put The New Yorker on notice that something was amiss. Because Malcolm had represented to The New Yorker' § editor-in-chief that all of her quotations were on tape, it would have been relatively simple to resolve the dispute. The New Yorker' § apparent failure to do so would justify a jury finding that the magazine acted in reckless disregard of the truth. See Harte-Hanks Communications, Inc. v. Connaughton, --- U.S. ----, ----, 109 S.Ct. 2678, 2693, 105 L.Ed.2d 562 (1989) ("The newspaper's decision not to listen to the tapes of the Stephens interview in Connaughton's home also supports the finding of actual malice.").
 
 
 242
 In his brief, Masson claims that The New Yorker was once again put on notice of the alleged misstatement when Masson's lawyer wrote to the magazine after the first part of the Malcolm article appeared. Brief for Appellant at 46. The New Yorker apparently did not attempt to verify the balance of the article or to make any corrections. A jury might reasonably infer recklessness from this conduct as well. See St. Amant v. Thompson, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968) ("recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports").
 
 
 243
 Finally, a jury could consider The New Yorker' § widely-acclaimed reputation for scrupulous accuracy in determining whether it acted in a reckless manner. See, e.g., Wall St. J., June 18, 1984, at 1, col. 4 ("the New Yorker, often touted in journalistic circles as a magazine whose statements of fact can be taken without benefit of any grains of salt"); id. (" 'I would say they're about the most careful (publication) about checking facts,' says Spencer Klaw, editor of the Columbia Journalism Review."); Boston Globe, June 20, 1984, at 44, col. 4 (referring to "the New Yorker magazine's longstanding reputation for unrivaled accuracy"); N.Y. Times, July 3, 1984, at C9, col. 1 (quoting writer Renata Adler as stating that "The New Yorker set a kind of standard for factual accuracy"); id., June 20, 1984, at 26, col. 1 (describing The New Yorker' § fact-checkers as "legendary"); T. Goldstein at 206 (referring to "The New Yorker' § vaunted reputation for accuracy").
 
 
 244
 The New Yorker' § reputation for accuracy is no accident; it is an image it nurtures assiduously. At about the time Malcolm's article was published, editor-in-chief William Shawn proclaimed that "New Yorker reporting is 'as close to being scientific in its objectivity as reporting can be;' " he added that "the magazine tries to have 'no advocacy, to have no prejudices' " and that " '[a]t the New Yorker, not only accuracy but truthfulness is sacred.' " Wall St. J., June 18, 1984, at 1, col. 4. Martin Baron, head of The New Yorker' § fact-checking department that allegedly verified the accuracy of Malcolm's articles, graphically announced: " 'If we say the paint on the wall of the hospital is yellow, it's yellow'.... Every detail is 'absolutely correct down to whether or not there were coffee stains and tobacco ashes on the floor of the hospital' in a given piece." Id. In a burst of exuberance, Shawn proclaimed that " 'the New Yorker is the most accurate publication not only in this country, but in the entire world.' " Id. As to quotations, Shawn declared that "the New Yorker 'ideal is a verbatim quote.' " Id.[27]
 
 
 245
 Few publications have the bravado to give such categorical assurances to the reading public. By doing so, The New Yorker has induced a reasonable expectation of accuracy in the minds of sources and readers. The former are more likely to speak without reservation, lulled into believing that they will not be misquoted; the latter are more likely to accept at face value the quotes they read in New Yorker articles. A jury might well consider all of this relevant in determining whether The New Yorker was reckless.(c) Alfred A. Knopf
 
 
 246
 Defendant Alfred A. Knopf's potential liability stands somewhere between that of Janet Malcolm and that of The New Yorker. While a book publisher, like a magazine publisher, has a right to rely on those who submit manuscripts to it, it does not have the right to ignore clear indications that material it is about to publish is libelous. Knopf published Malcolm's article in book form in May 1984, five months after the article first appeared in The New Yorker. By that time, Masson's allegations were known to Knopf's president. CR 101 at exhibit 41. Like The New Yorker, Knopf had a means for resolving the dispute: It could have asked Malcolm to document the disputed quotes, particularly by reference to the tapes. If, on the basis of such an examination, Knopf had concluded, wrongly perhaps, that Malcolm's quotes were accurate, I would hold it harmless. See Hotchner, 551 F.2d at 913-14 (discussed 1471-72 supra ); Velle Transcendental Research Ass'n, Inc. v. Sanders, 518 F.Supp. 512, 519 (C.D.Cal.1981) (publisher has no subjective awareness of falsity or reason to suspect that material is false where there had been no prior complaint about author, author was believed to be reliable and defendant relied on reputation of previous publisher). But failure to investigate the matter at all could well amount to recklessness, particularly where a book publisher (unlike a magazine) is not operating under a tight publication deadline. I can see no justification for allowing a publisher to reprint an article accused of containing libelous material without bothering to investigate the matter, when a simple, foolproof method of investigation was available. A jury might easily conclude that Knopf's cavalier treatment of Masson's complaint amounted to a reckless disregard of the truth and, if it did, we would have no choice but to affirm.
 
 Conclusion
 
 247
 Truth is a journalist's stock in trade. To invoke the right to deliberately distort what someone else has said is to assert the right to lie in print. To have that assertion made by The New Yorker, widely acknowledged as the flagship publication when it comes to truth and accuracy, debases the journalistic profession as a whole. Whatever it might have taken to refute Masson's allegations on the merits is not, in my view, worth the unsettling implications left by defeating him on these grounds. Masson has lost his case, but the defendants, and the profession to which they belong, have lost far more.
 
 
 
 [1]
 The dissent argues this case is similar to Selleck v. Globe Int'l, Inc., 166 Cal.App.3d 1123, 212 Cal.Rptr. 838 (1985). We disagree. First, Selleck is inapplicable because it involved only the question whether quotations attributed to Tom Selleck's father, apparently a private figure, could have a defamatory impact. In reversing the trial court's decision to grant a demurrer on the plaintiff's defamation claim, the court never discusses "actual malice"; in fact, the Selleck court assumes that the plaintiff was never interviewed and that the quotes were wholly fabricated. 166 Cal.App.3d at 1132, 212 Cal.Rptr. at 844. Even if one assumes that the court decided sub silentio that the plaintiff was a public figure and that he had made a sufficient showing of actual malice, Selleck is consistent with the Carson case discussed supra at 1454-55
 
 
 [2]
 The dissent argues that the Dunn rationale applies only in situations involving translations from one language to another. Dissent, at 1471. We disagree. The problem in Dunn was not the translation of the Mayor's words but the summary of those remarks. The newspaper editors in Dunn were not attempting to translate a particular word for which there was no exact equivalent in Spanish; instead, they sought to "express the gist of the mayor's remarks" by means of the fabricated quotation. 833 F.2d at 451. The problems created by summarization obviously are not unique to translation
 
 
 [3]
 The dissent argues that Hotchner only stands for the proposition that malice will not be inferred from an altered quotation when the alteration does not increase the defamatory impact of the quotation. Dissent, at 1472. We disagree. The Second Circuit refused to infer malice in Hotchner not only because the alteration did not alter the defamatory impact of the quotation, but also because the alteration did not "alter the substantive content" of the quotation. Hotchner, 551 F.2d at 914
 
 
 [4]
 Other portions of the taped interviews reveal that Masson repeatedly boasted of his ability to seduce or "charm" the senior analysts, including Kurt Eissler and Anna Freud. He told Malcolm, for example, that
 "I had managed to worm my way into the good graces of Eissler and Anna Freud and Muriel Gardner through charm and this had worked on them, and they had like fallen into a spell. I had mesmerized them...."
 On other occasions, Masson told Malcolm that Eissler "adored me," and was "very easily taken in."
 Although Masson argues that "intellectual gigolo" differs from his taped comments in that it has sexual connotations, it also appears that on at least one occasion Masson himself employed sexual metaphors to describe his and other young analysts' relationships with Eissler as "Suck stories. They're great suckers and it's a question of who can suck the most ... Oh God, did it go through it."
 All of these undisputed statements tend to prove that Masson conceptualized his relationship with Eissler and Freud at least in part as an intimate, mysterious, and perhaps surreptitious diversion--not unlike that of a "gigolo." Although we cannot at this stage in the proceedings make credibility determinations or resolve conflicts in the evidence, we can and must evaluate how Masson's actual malice evidence stacks up against the "clear and convincing" standard of proof. Masson indisputably made numerous statements which were the substantive equivalent of the "intellectual gigolo" quote Malcolm used; Masson's only proof that he never said such a thing is his simple, albeit vehement, denial. This showing is simply insufficient to pass muster under the applicable standard of proof.
 
 
 [5]
 Although the Herbert court denied that it was applying the Simmons "incremental harm" doctrine, it recognized that the test was very possibly another variation of the "libel proof" doctrine
 
 
 [1]
 This is not hyperbole. The majority articulates its premise explicitly: "For the purpose of this appeal, we assume the quotations were deliberately altered." Majority op. at 1454
 
 
 [2]
 A somewhat dated journalistic manual makes the point clearly:
 The direct quotation of a man's remark or his exact statement is always more effective than a summary or an indirect quotation. Editorial writers use quotation marks frequently to increase the force of their statements.
 G.M. Hyde, A Course in Journalistic Writing 240 (1922).
 
 
 [3]
 John L. Hulteng, a veteran reporter and former Dean of the School of Journalism at the University of Oregon, makes this point clearly:
 The impression created by a quotation can be as important as the literal accuracy of that quotation, and thus placement and context become elements of reality so far as the perception of the quote may be concerned. So when a reporter--or the writer of a book, for that matter--undertakes to "rejigger" someone else's ideas or observations he lies under a strong ethical obligation to be sure that he has not tampered with the essential reality of the material.
 Editing copy is just as consequential an act of journalistic gatekeeping as reportorial selection of detail or choice of quote fragments.
 J.L. Hulteng, The Messenger's Motives: Ethical Problems of the News Media 74 (1976).
 
 
 [4]
 The same is true of the final statement the majority relies on, namely "[I] could single-handedly bring down the business [of Freudian psychology]." Majority op. at 1459. Masson was plainly puffing the significance of his discoveries, not claiming to be the intellectual Atlas of the profession
 
 
 [5]
 American Gigolo, a movie about a male prostitute, exemplifies the pejorative connotation the term gigolo has gained in our society
 
 
 [6]
 In a curious about-face, the majority concedes that gigolo might be subject to a less wholesome interpretation, but justifies its use by reference to others of Masson's comments that the majority construes as "sexual metaphors." Majority op. at 1457 n. 4. The cited passages provide scant support for the majority's conclusion; just as it adopted an idiosyncratically puritanical definition of gigolo, the majority must strain to attribute a salacious meaning to Masson's words. Thus, Masson's reference to "[s]uck stories" and his discussion of who, among young analysts, "can suck the most," has only the most remote connection with sex. As I understand common parlance, sucking up is an expression similar to kissing up or buttering up, meaning to flatter or curry favor with someone. See New Dictionary of American Slang 422 (R.L. Chapman ed. 1986). I cannot agree with the majority that Masson's reference to "[s]uck stories" would inevitably lead a jury to conclude that "Masson conceptualized his relationship with Eissler and Freud ... as an intimate, mysterious, and perhaps surreptitious diversion--not unlike that of a 'gigolo.' " Majority op. at 1457 n. 4
 The dramatically different interpretations the majority and I give to this passage illustrate the volatile nature of the test the majority adopts. Under the majority's rationale, Malcolm would have been justified in quoting Masson as saying "I often had oral sex with Eissler," that, after all, being a rational interpretation of the expression suck up as the majority understands it.
 In any event, the majority's detour misses the point entirely. Masson is not complaining that he was painted as an actual gigolo; he complains about being called an intellectual gigolo, i.e. someone who would sell out intellectually to advance his career. Accepting at face value the majority's view that Masson viewed his relationship with Eissler and Freud as "intimate, mysterious, and perhaps surreptitious," how does that even slightly support the proposition that Masson thought himself an intellectual prostitute?
 
 
 [7]
 The majority pulls yet another arrow from its quiver, suggesting that Masson did not carry his burden of proving that he never called himself an intellectual gigolo because his "only proof that he never said such a thing is his simple, albeit vehement, denial." Majority op. at 1457 n. 4. "This showing," the majority concludes, "is simply insufficient to pass muster under the applicable standard of proof." Id
 My distinguished colleagues err twice. In the first place, they do not explain, and provide no citation for, the proposition that a party's sworn statement as to what was said during a two-party conversation is insufficient to create a triable issue of fact as to the contents of that conversation. Under normal circumstances, after all, there is no proof other than the parties' own conflicting allegations. The majority thus seems to create a new rule of libel law: In a swearing contest between reporter and subject, the reporter always wins.
 Equally troublesome is the majority's assertion that Masson has advanced nothing but his own word to contradict Malcolm's assertion that he called himself an intellectual gigolo. In fact, Masson has advanced much more than that:
 (1) While Malcom tape-recorded most of what Masson said, she now claims that some of Masson's most damaging statements--including his use of the term intellectual gigolo--were made during a conversation that was not recorded. Masson claims that he never made such a statement. The jury might infer from the absence of a tape recording that Malcolm fabricated the remark.
 (2) Malcolm represented to her editor, and later in a letter to the New York Times, that every quote from Masson was on tape. See p. 1483 infra. The jury might view this now repudiated assertion as an oversight, or it might conclude that Malcolm was telling the truth then and that she fabricated her more recent claim that some conversations were not taped.
 (3) Malcolm claims she made handwritten notes of the untaped conversation, but those notes have been destroyed; all we have is Malcolm's typewritten transcription of the notes. The jury could conclude that (a) Malcolm fabricated a transcription of a nonexistent conversation; (b) there was a conversation but Malcolm failed to take contemporaneous notes and the transcription reflects her faulty recollection of what was said; or (c) Malcolm took notes but recklessly or deliberately altered them during the transcription. The permutations are many and none are inherently implausible.
 (4) In her story, Malcolm describes in minute and lively detail the conversation during which Masson referred to himself as an intellectual gigolo. According to the story, the statement was made while she and Masson were having lunch at Chez Panisse in Berkeley. Malcolm now admits that the statement was made at a different time and place, while Masson was visiting her in New York. The jury might believe Malcolm when she explains that Chez Panisse was merely a literary backdrop, but it might also conclude that having fabricated one aspect of the conversation she would be capable of doing so twice.
 (5) There is direct evidence that Malcolm doctored other quotes to make them more bombastic. See 1482-83 infra. The jury might infer that Malcolm was not above inventing quotations in order to get her point across.
 Even if Masson's statement were not enough to create an issue of fact as to what he said to Malcolm, surely these additional circumstances are sufficient to entitle Masson to a jury trial as to whether or not he called himself an intellectual gigolo.
 
 
 [8]
 Masson described his promiscuity as neurotic behavior for which he sought treatment. Transcript of the Masson/Malcolm Tapes, vol. 1, part 1, at M243-45
 
 
 [9]
 The majority's analysis of the phrase "Eissler would have admitted I was right" is particularly instructive. Majority op. at 1460-61. The majority quotes a lengthy passage where Masson says that Eissler "agrees with me, of course;" the majority then notes that the reference for Masson's statement is ambiguous: "It is difficult to discern" what Eissler was agreeing with Masson about. The court nevertheless approves Malcolm's decision to attribute to Masson the statement "Eissler would have admitted I was right," because the quoted passage can be rationally interpreted as saying so. What if Masson was not saying so, a possibility the majority seems to admit is equally plausible? In that event, Masson is left with claiming something he in fact never said
 I have no quarrel with the proposition that if Masson said something ambiguous, Malcolm was entitled to select the interpretation she preferred and attribute it to Masson in her own words. But surely there is no justification for doctoring Masson's statement to remove the ambiguity and then pretending that Masson actually uttered it. The gist of the majority's analysis is that even if the author is wrong in guessing the speaker's meaning, her choice will be respected; the speaker's protestations that he in fact said the opposite, and that, if his statement had been preserved, some of the readers would have understood him, counts for nothing. In the marketplace of ideas, this gives the author an unjustified monopoly.
 
 
 [10]
 Whatever one may think about the merits of this case, there is no doubt that Janet Malcolm is an exceptionally talented writer. See, e.g., Malcolm, Books: Pink Roses, The New Yorker, June 26, 1989, at 89; Malcolm, Reflections: The Journalist and the Murderer, The New Yorker, Mar. 13, 1989, at 38 (part 1), Mar. 20, 1989, at 49 (part 2)
 
 
 [11]
 As reported by Castillo-Puche, Hemingway's actual words were: "[Hotchner is] dirty and a terrible ass-licker. There's something phony about him. I wouldn't sleep in the same room with him." 551 F.2d at 914
 
 
 [12]
 There is, of course, a fundamental difference between altering a quotation slightly, while remaining faithful to "the central meaning, the spirit, of a speaker's words," and changing the words to conform to the writer's reasonable interpretation of what the speaker said. Under the central meaning standard, where the words uttered are ambiguous, they may not be altered to remove the ambiguity because that would change the spirit of what the speaker said; under the reasonable interpretation standard adopted by the majority, the author is given precisely that privilege. See majority op. at 1456-59, 1462-63
 
 
 [13]
 Tom Goldstein, dean of the Graduate School of Journalism, University of California at Berkeley, describes the New Journalism as follows:
 In an advertisement, Harper's Magazine tried defining New Journalism metaphorically as "somewhere west of journalism and this side of history," the "place where reporting becomes literature." In this uncharted territory, writers embellished quotes, burrowed into characters' interior thoughts, created scenes that may have happened but did not, and made up characters who were collages of real people.
 T. Goldstein, The News at Any Cost: How Journalists Compromise Their Ethics to Shape the News 211 (1985).
 
 
 [14]
 In 1980 writer John Hersey launched a ferocious attack on the New Journalism. Hersey's premise was simple:
 ... I will assert that there is one sacred rule of journalism. The writer must not invent. The legend on the license must read: NONE OF THIS WAS MADE UP. The ethics of journalism, if we can be allowed such a boon, must be based on the simple truth that every journalist knows the difference between the distortion that comes from subtracting observed data and the distortion that comes from adding invented data.
 Hersey, The Legend on the License, The Yale Rev., Autumn 1980, at 1, 2 (emphasis original).
 
 
 [15]
 Professor Olen notes two notorious examples:
 In 1981, Washington Post reporter Janet Cooke was forced to return a Pulitzer Prize after she admitted to her editors that "little Jimmy," an eight-year-old drug addict who was the focus of her prize-winning article, did not exist. He was, she said, a composite. The same year, the New York Daily News fired Michael Daly upon learning that a soldier appearing in a column Daly had written about Northern Ireland was a composite.
 J. Olen at 97.
 
 
 [16]
 The Wall Street Journal quotes Shawn as saying: " 'I've worked with Mr. Reid for many, many years. I trust him completely, and he's not trying to deceive anybody, including me.... He's a man of utter integrity, and that's all I have to know.' " Wall St. J., June 18, 1984, at 1, col. 4
 
 
 [17]
 Shawn seems to recognize this distinction. While declaring that "the New Yorker 'ideal is a verbatim quote,' " he emphasized that " 'the most important thing is not to violate the truth ... of what somebody has said.' " Wall St. J., June 18, 1984, at 1, col. 4
 
 
 [18]
 It would, in any event, be naive to take journalists entirely at their word as to what is, and is not, considered ethical in a profession not completely free from breast-beating and finger-pointing. See Karlen, Naked City, Spy, June 1989, at 32
 
 
 [19]
 Authorities in the field of journalism are fairly uniform in suggesting that if authors or publishers have a policy of altering quotes or other facts, they disclose that policy to the reading public. See, e.g., T. Goldstein, The News at Any Cost: How Journalists Compromise Their Ethics to Shape the News 203, 206 (1985). Professor Olen gives a few examples of how this might be accomplished:
 Readers should know that reconstruction and cleaning up are going on. If they don't, they are being misled, however benignly. Newspapers and magazines have a variety of ways of telling their readers. A column on the op-ed page under a title like "Why People in Newspapers Talk So Much Better than You Do" is one. A frank admission of quotation policy in the ombudsman column of a newspaper or editor's page of a magazine is another.
 J. Olen at 101.
 An elegant and unobtrusive example of such disclosure is provided by Dr. Nathaniel Branden in an "Author's Note" to his recently published memoir:
 In instances where I reproduce conversations that took place many years ago, I am not suggesting that all of the words reported are verbatim, but I am confident they are faithful to the essence of what was said and to the spirit and mood of the occasion. This conviction has been reinforced by those, acknowledged below, who knew one or more of the people about whom I write and who affirm that my characterizations match their own memories of the individual's attitudes, beliefs, behavior, and spoken style.
 In the course of this book I recreate a great many conversations with Ayn Rand. Prior to our break, Ms. Rand said publicly and on more than one occasion that I knew her thoughts more profoundly and specifically than any other human being and that I was qualified to speak for her on virtually any aspect of her ideas or convictions.
 N. Branden, Judgment Day: My Years With Ayn Rand ix (1989).
 An explicit statement may not be required if it is clear from context "that the use of quotes is for dramatic effect and not to indicate an exact rendering." J. Olen at 98. Professor Olen cites as an example a book where the author gives verbatim quotes of conversations which he clearly did not witness. Id.
 
 
 [20]
 An immaterial change might have been the removal of "still a, a, a man," obviously an unintended hesitation, and the substitution of "still a man."
 
 
 [21]
 Liberty Lobby rejected the incremental harm doctrine both as a matter of District of Columbia law and as a matter of federal constitutional law. 746 F.2d at 1569. To the extent the court today accepts the doctrine on constitutional grounds, it is creating a square conflict with the District of Columbia Circuit
 
 
 [22]
 The majority also finds that "the 'intellectual gigolo' quotation is not defamatory" because "a fair reading of the quotation shows author Malcolm is portraying Masson as reporting Kurt Eissler's and Anna Freud's opinions about him." Majority op. at 1457. I am baffled by this reasoning; surely the intellectual gigolo label is going to harm Jeffrey Masson's career whether he uttered it about himself or whether it reflected Eissler's and Freud's assessment of him. For Eissler, Masson's employer, to call him an intellectual gigolo is, I should think, at least as bad as for Masson to so call himself
 Rightly troubled about giving a journalist the power to force a subject to call himself an intellectual gigolo, the majority resorts to a number of strategies to avoid the term's impact. See id. at 1457-58. As demonstrated here and supra at 1467-68, none of these work; the majority must accept the full consequences of its holding.
 
 
 [23]
 Malcolm suggests an alternative source for the offending quotations, namely her notes of non-taped conversations where Masson allegedly made those statements more or less verbatim. But the jury might well disbelieve Malcolm's account of these alleged conversations, conversations that Masson denies ever took place. See n. 7 supra. Because we are reviewing a grant of summary judgment against Masson, we must indulge these inferences in his favor
 
 
 [24]
 Masson claims that Malcolm is in fact an employee. Brief for Appellant at 46. If at trial Malcolm were found to be an employee of The New Yorker acting within the scope of her employment, the magazine could be held liable under the doctrine of respondeat superior. Cantrell v. Forest City Publishing Co., 419 U.S. 245, 253, 95 S.Ct. 465, 470, 42 L.Ed.2d 419 (1974)
 
 
 [25]
 Interestingly, "[a]t The New Yorker, quotations are generally not subjected to the magazine's rigorous fact-checking requirements. The rationale for this, according to Martin Baron, the magazine's chief fact-checker, is that a source cannot be expected to remember weeks or months later his precise words. Further, said Baron, a source might subsequently deny having said something because the statement places him in an unflattering light." T. Goldstein, The News at Any Cost: How Journalists Compromise Their Ethics to Shape the News 205 (1985) (relying on an interview with Martin Baron, January 25, 1985). These reasons seem entirely inapposite where the editors are aware that the conversations are on tape
 The New Yorker is not unique in refusing to clear quotations with sources. Some authorities believe that this is a mistake. Dean Goldstein, for example, suggests that "[a] lot of the mistrust between journalists and those whom they interview could be reduced if journalists were more willing to clear quotations or articles with the subjects of interviews before publication." Id. at 204. Professor Olen recognizes the risk that the source may wish to disown unflattering quotes, but nevertheless commends the practice: "The purpose of quoting people is rarely to get down which [words] they picked [to express an idea] on a particular occasion, but to give readers a feel for their personalities and how they express themselves. If the speakers are satisfied with the quotes, the journalist has fulfilled that purpose." J. Olen, Ethics in Journalism 100 (1988).
 
 
 [26]
 The record corroborates portions of Masson's account of this incident. Nancy Franklin is, in fact, a fact-checker for The New Yorker and, on deposition, admitted that she had talked to Masson about the Malcolm piece. CR 96, exhibit F at 64. A number of the corrections Masson claims to have suggested to Franklin in fact found their way into galleys but did not make it into the published version of the article. Compare CR 100 at exhibit 3 with Malcolm II at 106; CR 100 at exhibit 4 with Malcolm I at 59
 
 
 [27]
 This statement seems somewhat at odds with The New Yorker' § policy regarding the checking of quotations. See n. 25 supra